JOHN A. CURRAN III, ADMINISTRATOR (ESTATE
OF LEEANN CURRAN), ET AL. *v.*
SHERRY L. KROLL ET AL.
(SC 18585)

Rogers, C. J., and Norcott, Palmer, Zarella, McLachlan and Vertefeuille, Js.

Argued December 8, 2011—officially released March 13, 2012

*Michael G. Rigg*, with whom was *Donna R. Zito*, for the appellants (named defendant et al.).

*Kathleen L. Nastri*, with whom was *Cynthia C. Bott*, for the appellee (substitute plaintiff).

*Opinion*

VERTEFEUILLE, J. The substitute plaintiff, Ryan P. Curran (plaintiff),[1] the successor administrator of the estate of Leeann Curran (decedent), brought this medical malpractice action against the defendants, Sherry L. Kroll, a physician, and the Medical Center of Northeast Connecticut, LLP,[2] claiming, inter alia, that Kroll had failed to warn the decedent adequately of certain risks associated with the use of birth control pills and the symptoms of those risks. The trial court directed a verdict in favor of the defendants and rendered judgment accordingly. The plaintiff then appealed to the Appellate Court, which reversed the judgment of the trial court and remanded the case for a new trial. *Curran* v. *Kroll*, 118 Conn. App. 401, 417, 984 A.2d 763 (2009). Thereafter, this court granted the defendants'

---

[1] This action originally was brought by the named plaintiff, John A. Curran III, the husband of the decedent, Leeann Curran, and the initial administrator of her estate. During the pendency of the action, John A. Curran III, died, and Ryan P. Curran, the decedent's son, was substituted as the plaintiff.

[2] In addition to Kroll and the Medical Center of Northeast Connecticut, LLP, the original complaint also named Saul Ahola, Jane Doyle, William Johnson, Marie Livigni, Paul Matty and Lee Wesler as defendants. The complaint was withdrawn as to these defendants before trial. References herein to the defendants are to Kroll and the Medical Center of Northeast Connecticut, LLP, jointly.

petition for certification to appeal, limited to the following issue: "Did the Appellate Court properly reverse the trial court's granting of a directed verdict in favor of the defendants?" *Curran* v. *Kroll*, 295 Conn. 915, 990 A.2d 866 (2010). We affirm the judgment of the Appellate Court.

The opinion of the Appellate Court sets forth the following facts, construed in the light most favorable to the plaintiff, and procedural history.[3] "The decedent died on June 8, 2002, as a result of blood clots in her lungs that likely originated in her left thigh, traveled through her venous system and her heart and lodged in her lungs. The official cause of her death was determined to be bilateral pulmonary emboli caused by deep vein thrombosis.[4]

"On May 6, 2002, approximately one month before her death, the decedent, a forty-five year old woman, attended a scheduled office visit with her primary care physician . . . Kroll, at which time the decedent complained of menopausal symptoms, including mood swings, hot flashes, dysmenorrhea (painful periods), and menometrorrhagia (irregular and heavy periods). To help alleviate those symptoms . . . Kroll prescribed Desogen, an oral contraceptive or birth control pill, which was dispensed to the decedent in one of its generic forms, Apri, by her pharmacy. Both medications substantially are the same. Near the end of May, the decedent told her mother, Kathy Stilwell, that she 'felt terrible' and did not want to continue taking the pills

---

[3] We have supplemented the Appellate Court's recitation of the facts with additional relevant facts supported by the evidence produced at trial.

[4] "A deep vein thrombosis is a 'blood clot in the deep [vein] system of the legs,' which occurs primarily in the thigh and the calf. If one of the clots breaks off from the vein where it has formed and travels through the venous system, through the heart, lodging in the pulmonary artery, it causes what is known as a pulmonary embolism, or a blood clot in the lung. 'Bilateral pulmonary emboli' refers to blood clots in both lungs." *Curran* v. *Kroll*, supra, 118 Conn. App. 403–404 n.2.

because she was feeling worse than before she started taking them. The decedent also told Stilwell that she had telephoned . . . Kroll about this, but [Kroll] told her to continue on the medication, which she did. . . . Kroll's office had no record of the decedent having made this telephone call, however. At some point in time after the decedent's May 6, 2002 office visit, the defendants lost or misplaced her medical chart, which later was re-created, in part, from a computer file in preparation for trial. Writings, such as some handwritten notations from . . . Kroll, the decedent's self-prepared patient information sheet, reports from other [physicians], handwritten notations from nurses or assistants in . . . Kroll's office and other items, however, could not be reproduced and were lost. . . . Kroll did testify, however, that it was her practice to dictate the results of a patient's examination and her recommendations, which then were stored electronically.

"On June 6, 2002, the decedent and Stilwell attended a meeting together. The decedent had considerable leg pain, however, and had to leave the meeting because of her discomfort. The decedent had no idea what was causing her pain. Although she went to work the next day, she had to leave work early due to continuing, significant leg pain. She speculated to Stilwell that perhaps she had done something to herself such as pull a muscle, but 'she truly had no idea what was wrong with her.' The decedent also told her husband [the named plaintiff, John A. Curran III; see footnote 1 of this opinion] that she had pain in her groin and that she could not figure out why. She speculated to him that perhaps she had pulled a muscle. She continued to complain about the pain through the evening of June 7, 2002. She and her husband were babysitting their two grandchildren that weekend. During the night, [the plaintiff] heard [the decedent] grunting in pain as the decedent's husband helped her get from their bedroom down the

stairs. She was continuing to experience leg pain. [The plaintiff] asked if they needed help, but the decedent's husband declined, explaining that he was taking the decedent downstairs so that she could elevate her leg. The decedent stayed on the couch because of the pain. [The plaintiff] left for work at approximately 4 a.m. and kissed the decedent goodbye as she lay on the couch. The decedent reassured him that she was okay.

"At approximately 6 a.m. on the morning of June 8, 2002, the decedent's seven year old granddaughter woke the decedent's husband to tell him that the decedent had fallen; the granddaughter was quite upset. The decedent had fallen and hit her head in the bathroom. Her husband helped the decedent get onto the couch, and he telephoned 911. The decedent complained to her husband that she was unable to breathe. The Plainfield fire department responded quickly, as did the Canterbury fire department. Members thereof began providing assistance to the decedent, but she lost consciousness and stopped breathing. They continued in their attempts to revive her while she was taken by ambulance to a hospital. The decedent never regained consciousness. The cause of the decedent's death was bilateral pulmonary emboli caused by deep vein thrombosis." *Curran* v. *Kroll*, supra, 118 Conn. App. 403–406.

After the decedent's death, the plaintiff brought this action alleging, inter alia, that Kroll negligently had failed to warn the decedent of the signs and symptoms of deep vein thrombosis. "[At trial] Kroll testified that her training included information about the risks and side effects of birth control pills. She further testified that the risks of 'blood clots are associated with the older formulations of birth control pills. The newer [formulation] of pills were designed specifically to try to reduce the risk. So, the data that is available is unclear to the degree that the risk was still present.' [Kroll] then acknowledged that 'one of the risks associated with

birth control pills can be blood clots,' but she also stated that she did not know if that same risk was associated with Desogen because the studies citing an increased risk were based on the older formulations of birth control pills.

"Despite stating that she did not know if the risks were associated with Desogen . . . Kroll later testified that she '[d]efinitely' would have advised the decedent of the risk associated with Desogen and deep vein thrombosis and that she also would have discussed with the decedent all side effects and the symptoms associated therewith before prescribing the medication. The decedent's patient file, which was a computer generated file created to replace the file lost by the defendants, had no indication that . . . Kroll had given an advisement to the decedent or the content of such an advisement, despite . . . Kroll's testimony that it was her practice to dictate the results of a patient's examination and her recommendations, which then were stored electronically. Nevertheless . . . Kroll testified that she told the decedent and all her patients for whom she prescribed birth control pills that there is an increased risk of blood clots, that blood clots are potentially life threatening, and that the symptoms of blood clots are pain, as a result of leg swelling, and redness.[5] Counsel for the plaintiff then pointed out to . . . Kroll that when . . . Kroll was questioned in a deposition on March 2, 2005, she had never mentioned telling the decedent to watch for pain but only that she should watch for swelling . . . Kroll then stated that she stood by her deposition testimony. Counsel for the plaintiff then asked: 'And standing by your deposition . . . would mean that when you counsel the patient about warning signs, the warning sign that you counsel is

---

[5] Kroll testified that she could not recall her discussion with the decedent "word for word," but that her discussions regarding the risks and side effects of oral contraceptives "doesn't differ greatly amongst patients."

swelling. Right?' . . . Kroll answered: 'Swelling. Yes.'[6]

[6] Before testifying that she stood by her deposition testimony, the following colloquy occurred between the plaintiff's counsel and Kroll:

"Q. And do you in the course of this discussion [with patients regarding the symptoms of deep vein thrombosis] . . . in addition to swelling, talk about pain?

"A. Yes.

"Q. Pain and swelling are two different things.

"A. Pain and swelling are two different things. But you can get . . . swelling without pain, you can get pain without swelling, but more commonly, they both occur together with redness.

"Q. Would a good, careful practitioner, who was seeing patients in May of 2002, also address the issue of leg pain with your patient?

"A. That is what I do, yes.

"Q. And when I asked you . . . on page thirty-seven of your deposition, what the conversation would consist of with your patients, did you mention pain? Leg pain?

"A. During my deposition, I did not mention leg pain.

"Q. And by the way, the question I asked you was what warning signs would you tell them to look out for. Right?

"A. Yes.

"Q. And you did not include in your answer at that time leg pain. Right?

"A. At that time I did not include [leg pain] in my answer, no.

"Q. And no other time in your deposition, did you?

"A. Not during my deposition, no.

"Q. And you understood . . . when I took your deposition, that was my opportunity on behalf of [the decedent] to find out what you knew, what you recalled, and what your testimony was going to be here today. Right?

"A. Yes, and I answered the questions to the best of my ability at that time.

"Q. Okay. You agree today that leg pain is something [that] should be addressed with the patient?

"A. Yes.

"Q. And specifically . . . what kind of pain are we talking about?

"A. It's usually local pain in the calf or thigh, wherever the swelling is.

"Q. Do you tell patients to watch for burning pain, sharp pain, cramping pain, dull pain, constant pain, intermittent pain? Do you specify?

"A. There is a lot that we need to go through with birth control pills so I usually just say pain. There's too many other things to talk about.

"Q. Too many other things to talk about because there are a lot of things that are involved and a lot of issues that are involved in a prescription of birth control pills?

"A. Absolutely. I mean, generally in an exam that lasts forty-five minutes or a twenty minute office visit, by the time you go through the symptoms, and the indications and the benefits and the contraindications and they consent [to] them, it takes a lot of time.

"Q. So what you would say is watch for pain?

. . . Kroll also stated that she would expect a patient, who has been properly counseled by her physician, to seek medical treatment when symptoms develop.

"The plaintiff's expert, Kenneth R. Ackerman, a board certified physician in internal medicine, testified that patients 'put on birth control pills . . . have a statistically increased risk of forming blood clots.' He also stated that his opinion would not change on the basis of the name of the birth control pill, whether it was

"A. Among other things.

"Q. And do you agree . . . that a good, careful physician, practicing in May of 2002, would have this discussion with a patient not just in medical terms, but to put it in lay terms so the patient can understand what you're saying?

"A. Definitely.

"Q. All right. So you wouldn't just say [deep vein thrombosis]. You'd say, look, a [deep vein thrombosis] is a blood clot in your leg. And that's one of the things that you need to watch out for. Right?

"A. I'll usually say, watch out for calf or thigh pain or swelling, shortness of breath, pain with taking a deep inspiration, headaches, chest pain, abdominal pain. These could represent cardiac conditions such as a heart attack, a pulmonary embolus or a blood clot in the leg—a pulmonary embolus is a blood clot to the lungs—or a migraine headache. So I tell them both in simple terms [what] to watch out for as far as their symptoms, I tell them the simple terms as far as the complications, and I also tell them some of the more technical terms.

"Q. Okay. And those simple terms that you use, should be terms that describe to the patient in words that she can understand, the symptoms, the seriousness of a potential condition, and what to do if they occur. Right?

"A. Yes.

"Q. Because the patient needs to have the right information from the doctor so the patient can make the right decisions about what to do if those symptoms occur. Right?

"A. Yes."

After Kroll testified that she stood by her deposition testimony, the defendants' attorney asked Kroll, "[i]s there any doubt in your mind—I think we've established in the deposition in that particular answer you didn't mention pain. Any doubt in your mind you mentioned leg pain to [the decedent] on May 6, 2002?" Kroll responded, "no, because it comes after swelling, and redness, and pain, they come together." On redirect, the plaintiff's counsel asked, "I just want to clear up the issue of the deposition. Do you stand by your deposition testimony?" Kroll responded, "I stand by what I said that day."

Desogen, Apri or some other formulation. . . . Acker-man also stated that '[a]n internist would expect that a reasonable patient, who has been advised properly, will recognize the appropriate side effects of the medication . . . and receive medical attention . . . should those symptoms or signs appear.'

"The deposition testimony of the decedent's husband was read for the jury. In relevant part, her husband had testified that the decedent had told him that she had pain in her groin but that she could not figure out why. She speculated to him that perhaps she had pulled a muscle. Stilwell, the decedent's mother, testified at trial that the decedent told her when she started taking the prescribed birth control pills and that the decedent also told her that she telephoned . . . Kroll's office near the end of May because she was not feeling well taking the medication, and she wanted to stop but that . . . Kroll asked her to continue taking it. [Stilwell] further testified that she and the decedent attended a meeting the Thursday evening before the decedent died but that the decedent had to leave the meeting because she was experiencing considerable leg pain of an unknown cause. Further, Stilwell testified that the decedent went to work the following day but had to leave work early because of significant and continued leg pain. The decedent then speculated to Stilwell that maybe she had pulled a muscle; Stilwell said that the decedent 'truly had no idea what was wrong with her.' " Id., 411–13.

In addition to the foregoing, the evidence presented at trial established that the decedent had received a bachelor of arts degree in human development from Connecticut College in 2001, graduating magna cum laude as a member of the Phi Beta Kappa honor society, and that she had taken graduate level courses at Saint Joseph's College in the 2001–2002 academic year.

"In his third amended complaint, the plaintiff alleged a claim of medical malpractice against the defendants,

claiming that . . . Kroll was negligent in failing to advise the decedent of the risks of her recommended treatment of birth control pills and in failing to inform the decedent of the signs and symptoms associated with such risks. The parties agreed that the standard of care requires a treating physician to provide such warnings and instruction to a patient. After the plaintiff presented his evidence, the defendants moved for a directed verdict. . . . Following argument on the motion, the court concluded that there was no evidence that . . . Kroll had breached the standard of care and that a failure to warn claim could not be based solely on an inference that might be drawn from the decedent's failure to seek help. Accordingly, the court directed a verdict in favor of the defendants and rendered judgment accordingly." Id., 406.

The plaintiff appealed from the judgment of the trial court to the Appellate Court. Id. The Appellate Court concluded that, contrary to the trial court's conclusion, the evidence presented by the plaintiff at trial would support a reasonable inference that Kroll had failed to warn the decedent adequately of the signs and symptoms associated with the risks of taking birth control pills. Id., 417. Accordingly, it reversed the judgment of the trial court and remanded the case for a new trial. Id. This appeal followed. The defendants claim that: (1) the Appellate Court's decision was based on speculation; and (2) the Appellate Court improperly decided the appeal on grounds that were not raised by the plaintiff in the trial court.

We begin our analysis with the standard of review of a trial court's decision to grant a motion for a directed verdict. Whether the evidence presented by the plaintiff was sufficient to withstand a motion for a directed verdict is a question of law, over which our review is plenary. *DiStefano* v. *Milardo*, 276 Conn. 416, 422, 886 A.2d 415 (2005) ("[w]hether the plaintiff has established

a prima facie case entitling the plaintiff to submit a claim to a trier of fact is a question of law over which our review is plenary"). "Directed verdicts are not favored. . . . A trial court should direct a verdict only when a jury could not reasonably and legally have reached any other conclusion. . . . In reviewing the trial court's decision to direct a verdict in favor of a defendant we must consider the evidence in the light most favorable to the plaintiff. . . . Although it is the jury's right to draw logical deductions and make reasonable inferences from the facts proven . . . it may not resort to mere conjecture and speculation. . . . A directed verdict is justified if . . . the evidence is so weak that it would be proper for the court to set aside a verdict rendered for the other party." (Internal quotation marks omitted.) *Motzer* v. *Haberli*, 300 Conn. 733, 743, 15 A.3d 1084 (2011). This court has emphasized two additional points with respect to motions to set aside a verdict that are equally applicable to motions for a directed verdict: "First, the plaintiff in a civil matter is not required to prove his case beyond a reasonable doubt; a mere preponderance of the evidence is sufficient. Second, the well established standards compelling great deference to the historical function of the jury find their roots in the constitutional right to a trial by jury."[7] *Gaudio* v. *Griffin Health Services Corp.*, 249 Conn. 523, 534–35, 733 A.2d 197 (1999).

"[I]t is [the] function of the jury to draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . . Because [t]he only kind of an inference recognized by the law is a reasonable one . . . any such inference

---

[7] Of course, when determining whether a trial court properly granted a motion for a directed verdict, we do not defer to the jury's *verdict*, as the jury has not been permitted to reach a verdict. We do give great weight, however, to the plaintiff's constitutional right to have his or her case presented to a jury.

cannot be based on possibilities, surmise or conjecture. . . . It is axiomatic, therefore, that [a]ny [inference] drawn must be rational and founded upon the evidence. . . . However, [t]he line between permissible inference and impermissible speculation is not always easy to discern. When we infer, we derive a conclusion from proven facts because such considerations as experience, or history, or science have demonstrated that there is a likely correlation between those facts and the conclusion. If that correlation is sufficiently compelling, the inference is reasonable. But if the correlation between the facts and the conclusion is slight, or if a different conclusion is more closely correlated with the facts than the chosen conclusion, the inference is less reasonable. At some point, the link between the facts and the conclusion becomes so tenuous that we call it speculation. When that point is reached is, frankly, a matter of judgment. . . .

"[P]roof of a material fact by inference from circumstantial evidence need not be so conclusive as to exclude every other hypothesis. It is sufficient if the evidence produces in the mind of the trier a reasonable belief in the probability of the existence of the material fact. . . . Thus, in determining whether the evidence supports a particular inference, we ask whether that inference is so unreasonable as to be unjustifiable. . . . In other words, an inference need not be compelled by the evidence; rather, the evidence need only be reasonably susceptible of such an inference. Equally well established is our holding that a jury may draw factual inferences on the basis of already inferred facts." (Citations omitted; internal quotation marks omitted.) *State v. Copas*, 252 Conn. 318, 338–40, 746 A.2d 761 (2000). Finally, it is well established that a plaintiff "has the same right to submit a weak case as he has to submit a strong one." (Internal quotation marks omitted.) *Cadle*

*Co.* v. *D'Addario,* 268 Conn. 441, 462, 844 A.2d 836 (2004).

The parties in the present case agree that the plaintiff's claim that the defendants negligently failed to warn the decedent of the signs and symptoms of the risks associated with taking oral contraceptives is akin to a cause of action for lack of informed consent. "In order to prevail on a cause of action for lack of informed consent, a plaintiff must prove both that there was a failure to disclose a known material risk of a proposed procedure and that such failure was a proximate cause of his injury. Unlike a medical malpractice claim, a claim for lack of informed consent is determined by a lay standard of materiality, rather than an expert medical standard of care which guides the trier of fact in its determination." *Shortell* v. *Cavanagh,* 300 Conn. 383, 388, 15 A.3d 1042 (2011). Under this "lay standard of disclosure," a physician is obligated "to provide the patient with that information which a reasonable patient would have found material for making a decision whether to embark upon a contemplated course of therapy." *Logan* v. *Greenwich Hospital Assn.,* 191 Conn. 282, 292–93, 465 A.2d 294 (1983). Thus, by analogy to these cases involving claims of lack of informed consent, to establish a prima facie case in the present case, the plaintiff was required to present evidence that Kroll failed to provide the decedent with advice regarding any symptoms and risks associated with oral contraceptives that would enable a reasonable patient to recognize the development of, and seek treatment for, such a symptom or risk, and that Kroll's failure to advise the decedent adequately was the proximate cause of her injury.[8]

[8] The defendants concede that Kroll had a duty to advise the decedent of the symptoms and risks associated with the use of oral contraceptives, and that, in general, the purpose of providing such advice is to enable patients to seek medical treatment if and when the symptoms appear, although they do not always do so.

With these principles in mind, we turn to the defendants' claim in the present case that the Appellate Court improperly determined that the evidence produced by the plaintiff would support a reasonable inference that Kroll failed to advise the decedent that leg pain was a symptom of deep vein thrombosis. We disagree. The evidence showed that the decedent's office visit with Kroll was on May 6, 2002, and that she was suffering menopausal symptoms that caused her significant discomfort at that time. Kroll prescribed oral contraceptives to alleviate the symptoms. A few weeks later, in late May, the decedent told her mother that she wanted to discontinue the use of the oral contraceptives because she felt worse than before she started taking them. The decedent also indicated that she had telephoned Kroll and told her that she felt worse, but Kroll had advised her to continue taking the medication. On June 6, 2002, only one month after she began taking the oral contraceptives, the decedent began to experience significant leg pain. The pain continued the next day, and the decedent indicated to both her mother and her husband that she "had no idea" what could be causing it. The pain was significant and persistent and caused the decedent to leave an evening meeting early and then leave her employment early the following day. The evidence also showed that the decedent was intelligent and well educated. Finally, Kroll's testimony regarding the advice that she gave to the decedent was equivocal. Although Kroll stated a number of times that it was her standard practice to warn patients for whom she prescribed oral contraceptives that they should watch for leg pain, she also stated repeatedly that she "stood by" her deposition testimony that she warned such patients to watch for swelling.

On the basis of this evidence, a reasonable juror could have found that, during May of 2006, the decedent was actively engaged in seeking medical treatment for her

menopausal symptoms. A reasonable juror also could have inferred from the fact that the decedent had called Kroll to report that the oral contraceptives appeared to be making her feel worse that the decedent was aware that the pills could have side effects, that she was actively monitoring her physical response to the pills in the relevant time period, and that she was willing and able to seek medical advice and treatment when she believed that adverse side effects might be developing. In addition, a reasonable juror could have concluded that the decedent was fully capable of understanding, remembering and following any advice provided by Kroll regarding adverse side effects and their potential symptoms. The evidence also amply supported a reasonable inference that the decedent simply did not know what was causing her severe leg pain and that she drew no connection between it and her use of the oral contraceptives. Finally, the jury reasonably could have believed Kroll's repeated testimony that she "stood by" her deposition testimony that she warned her patients for whom she prescribed oral contraceptives to look out for swelling in the leg as a symptom of deep vein thrombosis, and discredited her equivocal and inconsistent testimony that she usually warned patients to look out for leg pain.[9]

Viewing this evidence in the light most favorable to the plaintiff, we conclude that it reasonably could have

---

[9] The defendants contend that the jury's disbelief of Kroll's testimony that she *had* warned the decedent about leg pain could not support an inference that she had *not* given such a warning. See *Paige* v. *St. Andrew's Roman Catholic Church Corp.*, 250 Conn. 14, 18, 734 A.2d 85 (1999) ("although the jury is entitled to disbelieve any evidence, it may not draw a contrary inference on the basis of that disbelief"). As we have indicated, however, Kroll testified at her deposition that she had warned the decedent about leg swelling. She did not testify at that time that she had warned the decedent about leg pain. At trial, she "stood by" her deposition testimony. Accordingly, there was affirmative evidence from which the jury reasonably could have inferred that Kroll had warned the decedent only about swelling.

supported an inference that Kroll had failed to advise the decedent that leg pain was a symptom of deep vein thrombosis. Although the evidence cannot be characterized as overwhelming, and it would not necessarily have *compelled* a finding that Kroll failed to warn the decedent about leg pain, it was sufficient to have produced "in the mind of the trier a reasonable belief in the *probability* of the existence of the material fact." (Emphasis added; internal quotation marks omitted.) *State* v. *Copas*, supra, 252 Conn. 339–40. We therefore reject the defendants' claim that the Appellate Court's conclusion that the evidence was sufficient to present the case to the jury was based, not on reasonable inferences, but on speculation.

The defendants also contend that the Appellate Court improperly decided the appeal on the basis of claims that the plaintiff did not raise in the trial court. Specifically, the defendants contend that the plaintiff never made the express claims that: (1) Kroll's alleged failure to document in the decedent's medical file any warning about the signs and symptoms of the risks associated with oral contraceptives would support an inference that Kroll had breached the standard of care; and (2) the decedent's telephone call to Kroll reporting that she was feeling worse after taking the pills would support an inference that the decedent would have sought immediate medical attention for her leg pain if Kroll had warned her that such pain can be a symptom of deep vein thrombosis.

With respect to the defendants' first claim, regarding Kroll's alleged failure to document her warning to the decedent, we agree with the defendants that, in the absence of any claim or testimony that the relevant standard of care required Kroll to document any warning given to the decedent in her medical file or of any evidence that that was her regular practice, Kroll's alleged failure to do so, standing alone, did not consti-

tute affirmative evidence that she gave no such warning. As we have indicated, however, there was other affirmative evidence from which the jury reasonably could have made this inference.[10] Accordingly, even if the Appellate Court improperly relied on the absence of documentation as affirmative proof that Kroll had not warned the decedent of leg pain, its conclusion that the evidence, considered in its entirety, was sufficient for the case to have been presented to the jury was independently supported.

With respect to the defendants' second claim, regarding the decedent's telephone call to Kroll reporting that she felt worse after taking the prescribed pills, we disagree that the plaintiff was required to argue specifically to the trial court that this evidence supported an inference that the decedent was monitoring her physical response to the contraceptive pills and was willing to seek medical attention for any symptoms that she believed were related to the pills. In determining whether the trial court properly granted the defendants' motion for a directed verdict, the Appellate Court was entitled—indeed, it was required—to consider *all* relevant evidence in the record, not just the evidence that the plaintiff expressly identified in his opposition to the defendants' motion for a directed verdict.[11] See *Larsen*

[10] Although the absence of any documentation in the decedent's medical file, in and of itself, would not support a reasonable inference that Kroll had not provided an adequate warning, the plaintiff was entitled to establish that nothing in the medical file was inconsistent with the other affirmative evidence supporting that inference, a fact about which the jury naturally would have been curious.

[11] We note that, at argument on the defendants' motion for a directed verdict, the plaintiff's attorney argued that "I rely on *what [the decedent] did* and didn't do, and the nature of her personality and her intellect and her education and *her responsibility and her attention to detail* as part of my case, as part of my proof that she wasn't advised." (Emphasis added.) The evidence that the decedent had called Kroll to report that she felt worse was evidence of what the decedent "did" and of her responsibility and attention to detail with respect to her treatment.

*Chelsey Realty Co.* v. *Larsen*, 232 Conn. 480, 500, 656 A.2d 1009 (1995) ("[i]n reviewing the trial court's decision to direct a verdict . . . this court considers *all the evidence*, including reasonable inferences, in the light most favorable to the [plaintiff]" [emphasis added]).[12]

We also are not persuaded by the defendants' argument that the Appellate Court improperly concluded

[12] In support of their claim to the contrary, the defendants rely on *Sequenzia* v. *Guerrieri Masonry, Inc.*, 298 Conn. 816, 821, 9 A.3d 322 (2010) ("Appellate Court may not reach out and decide a case before it on a basis that the parties never have raised or briefed" [internal quotation marks omitted]), *Sabrowski* v. *Sabrowski*, 282 Conn. 556, 561, 923 A.2d 686 (2007) (same), and *Lynch* v. *Granby Holdings, Inc.*, 230 Conn. 95, 97–98, 644 A.2d 325 (1994) (in absence of challenge to subject matter jurisdiction or claim of plain error, Appellate Court cannot address claim that was not raised in trial court or on appeal). In none of these cases, however, did this court conclude that the Appellate Court had improperly reversed a directed verdict in favor of a party because the other party had not expressly relied on a specific piece of probative *evidence* in opposing the directed verdict. Rather, in each case, this court concluded that the Appellate Court improperly resolved the appeal on the basis of a *claim* that the appellant had not raised in the trial court. See *Sequenzia* v. *Guerrieri Masonry, Inc.*, supra, 821 (defendant had abandoned instructional propriety claim); *Sabrowski* v. *Sabrowski*, supra, 560 (defendant had never claimed that trial court improperly had modified alimony award on basis of decrease in certain income of plaintiff); *Lynch* v. *Granby Holdings, Inc.*, supra, 97 (plaintiff had never claimed that damage award should be set aside because it manifested juror confusion). In the present case, the plaintiff's claim was that the trial court improperly had concluded that the evidence presented at trial was insufficient to present the case to the jury, and the Appellate Court did not go beyond that claim in resolving the appeal.

The defendants also rely on the principle that "[i]t is not the responsibility of the trial judge, without some specific request from a petitioner, to search a record, often, in a habeas case, involving hundreds of pages of transcript, in order to find some basis for relief for a petitioner." *Solek* v. *Commissioner of Correction*, 107 Conn. App. 473, 480, 946 A.2d 239, cert. denied, 289 Conn. 902, 957 A.2d 873 (2008). The court in *Solek* merely held, however, that a *habeas* court is not required to search the transcript of the underlying *criminal trial* for support for a petitioner's claim. See id. ("[t]he responsibility of a habeas court, in confronting an often voluminous *trial court* record, is to respond to those claims fairly advanced by the petitioner" [emphasis added]). *Solek* does not support the proposition that the trial court is not required to consider all of the evidence presented *to that court* in ruling on a motion for directed verdict.

that evidence of the decedent's telephone call to Kroll would support an inference that the decedent would have called Kroll about her leg pain if she had been warned about it because the evidence was not presented for that purpose, but only to establish that the decedent had begun taking the oral contraceptives when she developed the deep vein thrombosis. This evidence was admitted in full, without limitation. In the absence of any limiting instruction, the jury was entitled to draw any inferences from the evidence that it reasonably would support. *State* v. *Copas*, supra, 252 Conn. 338 ("it is [the] function of the jury to draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical" [internal quotation marks omitted]); cf. *O'Hara* v. *Hartford Oil Heating Co.*, 106 Conn. 468, 473, 138 A. 438 (1927) ("[*e*]*vidence which is offered and admitted for a limited purpose only* . . . cannot be used for another and totally different purpose" [emphasis added]).

The defendants further claim that the evidence regarding the decedent's telephone call to Kroll was inadmissible to raise an inference that she would have sought treatment for her leg pain if she had been properly warned under § 4-4 (a) of the Connecticut Code of Evidence, which provides that "[e]vidence of a trait of character of a person is inadmissible for the purpose of proving that the person acted in conformity with the character trait on a particular occasion . . . ."[13]

[13] The defendants also claim that the Appellate Court improperly held that the testimony of various witnesses that "persons generally seek to follow instructions of a medical nature concerning the serious symptoms associated with the side effects of medication"; *Curran* v. *Kroll*, supra, 118 Conn. App. 417; could support an inference that the decedent failed to seek medical treatment for her leg pain because she had not been warned that it was a symptom of deep vein thrombosis. The Appellate Court concluded that the evidence would support this inference "based on the same rationale that justifies the introduction of statements made for the purpose of obtaining medical treatment, namely that the patient has an interest in preserving her own health. See Conn. Code Evid. § 8-3 (5)." *Curran* v. *Kroll*, supra, 417

Because the defendants did not object to the introduction of the evidence or ask for a limiting instruction on this ground at trial, however, this claim is unreviewable. Moreover, even if the claim were reviewable, it is meritless. The evidence does not support an inference that, because the decedent had a general "character trait," namely, willingness and the ability to seek medical advice and treatment for symptoms about which she had been warned, she would have acted in conformity with that character trait if she had been adequately warned about leg pain. Rather, it shows that the decedent was actively monitoring and reporting to Kroll the effects of a *specific treatment* for a *specific medical condition* and, therefore, it raises the reasonable inference that, if she had been warned that leg pain was a symptom of a dangerous side effect of the treatment, she would have sought medical advice and treatment for her leg pain.

Finally, for all of the foregoing reasons, we reject the defendants' claim that the Appellate Court's conclusion that the evidence was sufficient to present the case to the jury violated the principle that "[t]he fact that . . .

n.5. As the Appellate Court suggested, the rule that a patient's hearsay statement to a medical provider is admissible is premised on the presumption that a patient will not lie when seeking medical treatment. There are many reasons, however, why a patient who presumptively has an interest in preserving her own health might not seek treatment if a symptom of a risk arises, even though the patient has been warned of the symptoms: the patient may have misunderstood or forgotten the warning; she may have downplayed the risk; she may be uncertain whether she is experiencing a symptom; or she may simply be unable or unwilling to seek medical treatment. Accordingly, we agree with the defendants that the mere fact that a patient did not seek treatment when a symptom arose, standing alone, does not imply that the patient was not properly warned about the symptom. As we have indicated, however, there was other evidence in the present case from which the jury reasonably could have inferred that the decedent was aware at the time that she experienced leg pain that the oral contraceptives could have negative side effects, that she was fully capable of understanding any warning given to her, that her leg pain was severe, and that she was willing and able to seek medical advice and treatment for any negative side effects.

treatment has resulted unfavorably does not, of itself, raise any presumption of want of proper care or skill." (Internal quotation marks omitted.) *Boone* v. *William W. Backus Hospital*, 272 Conn. 551, 576, 864 A.2d 1 (2005). In reaching its conclusion, the Appellate Court did not rely solely on the facts that the decedent failed to seek timely medical treatment for her leg pain and, ultimately, died. Rather, as we have indicated, that court relied on affirmative evidence that reasonably supported the inferences that the decedent was actively monitoring her response to the oral contraceptives in the relevant time period, that she was willing and able to seek medical advice and treatment if she experienced adverse effects, and, most significantly, that she did not know that her significant leg pain might be a symptom of a dangerous side effect of oral contraceptives. Accordingly, we conclude that the Appellate Court properly determined that the plaintiff produced sufficient evidence to present the case to the jury and reversed the trial court's ruling granting a directed verdict in favor of the defendants.

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.