STATE OF CONNECTICUT *v.* JOSEPH COTE
(AC 32650)

Lavine, Robinson and Bear, Js.

Argued March 7—officially released July 3, 2012

*Neal Cone*, senior assistant public defender, for the appellant (defendant).

*Michele C. Lukban*, senior assistant state's attorney, with whom, on the brief, were *Michael L. Regan* and *Peter A. McShane*, state's attorneys, for the appellee (state).

*Opinion*

ROBINSON, J. The defendant, Joseph Cote, appeals from the trial court's judgment of conviction, following a jury trial, of burglary in the third degree in violation of General Statutes § 53a-103 (a) and larceny in the second degree in violation of General Statutes (Rev. to 2009) § 53a-123 (a).[1] On appeal, the defendant contends that (1) because Public Acts 2009, No. 09-138 (P.A. 09-138), inter alia, increased the monetary value of property and services stolen necessary to constitute larceny in the second degree after the defendant's arrest, but before his conviction, the court erred in refusing to apply the ameliorative change to the defendant, (2) there was insufficient evidence to warrant the conviction of burglary and (3) the trial court erred in not granting the defendant's renewed motion to sever the trials of the defendant and the codefendant, Albert Kalil. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. At approximately 10 a.m., on January 27, 2009, Judith Stanton left her home located at 677 Pequot Trail in Stonington (Stonington property). When Stanton returned to her home at approximately noon, she realized that the telephone was no longer on the wall, the liquor cabinet was open and drawers had been opened in every room upstairs. Her jewelry box had been "torn apart," and pocket watches that were on display in a cabinet were missing. Jewelry, several $2 bills, a federal note and six $100 bills were missing from the property.

Lucinda Wesson, a neighbor who lived directly across the street from the Stonington property, noticed a car she did not recognize parked on her street the morning

---

[1] General Statutes (Rev. to 2009) § 53a-123 (a) was the revision of the statute in effect at the time the defendant committed the offenses on January 27, 2009, and is the revision used by the trial court in sentencing the defendant.

of January 27, 2009. It was a dark-colored[2] Saab convertible with a Massachusetts license plate. At that time, no one was in or near the car. Sometime later, Wesson went to the other side of her home, where she again saw the car because it was stationed outside her property. At this time, the passenger's side door was open, and a man was wandering in the middle of the street, appearing as if he were looking for something. The person driving the car said, "[g]et back into the car," and the parties then left. Both of the individuals had a "very thick Massachusetts accent." From her standpoint in her home, she believed the individual outside of the vehicle was approximately six feet tall,[3] and she apprised police that he was of Italian descent, with black hair, between forty and fifty years old, weighing approximately 200 pounds and wearing a red sweatshirt type jacket.[4]

An investigation at the Stonington property revealed that force had been used to open the rear door. An area of weather stripping that ran down the exterior of the door had been manipulated or moved. The damage was consistent with forced entry into the house. There were footprints in the snow outside the Stonington property that ran from the front of the home to the back door; however, the police were not able to get foot impressions.[5] The Stonington police filed a report with the National Crime Information Center detailing the incident.

---

[2] In her statement to the police, she indicated that the vehicle was dark green.

[3] She also testified that she was only looking at the individual from an angle and that it was hard to estimate his exact height.

[4] Although she reviewed her statement to the police in which she indicated that the passenger was wearing a red sweatshirt, she could not remember when she testified what color sweatshirt the passenger was wearing.

[5] Dale Brummond, an officer with the Stonington police department, testified that although there was no reference to the number of footprints in the police report, he recalled there being only one set of footprints at the Stonington property.

On January 27, 2009, at approximately 1:45 p.m., Raymond Driscoll, the police chief in Richmond, Rhode Island, drove past the home of an acquaintance located on 122 Kingston Road in Richmond. The homeowner's truck was not on the property; however, there was a black Saab convertible with Massachusetts license plates parked in the yard. Driscoll observed two men standing in front of the garage door looking into the garage through a window. He then observed one of the men looking through a door at the front step next to the garage. This man was "alternately looking over his shoulder between looking into the house." One of the men noticed that Driscoll was watching, and both men quickly walked to the Saab and drove away.

Driscoll followed the vehicle, which entered an abandoned gasoline station parking lot. While Driscoll was calling for additional police support, the operator of the vehicle got out of the car and walked over to him. Driscoll asked the operator for his license and registration, which he retrieved. The license identified the operator of the vehicle as the defendant, and his passenger was identified as Kalil.[6] The defendant volunteered that he and Kalil were on their way from a casino and had gotten lost. The defendant stated that they had stopped at the house to ask for directions and that they were running out of gasoline. Driscoll asked the defendant to turn the vehicle on, and Driscoll observed that the vehicle had more than one-quarter of a tank of gasoline remaining.

Kalil was wearing a "sweatshirt type jacket" and had a pair of bloodstained white athletic socks in his jacket pockets. There was also a cut on Kalil's hand. When asked why he had socks in his jacket pocket, Kalil responded that he had "bad feet." Kalil stated that he

---

[6] The police later determined that the car was registered to the defendant's sister.

and the defendant had been at the casino and that he had won $100. When asked why he was at the property located at 122 Kingston Road, Kalil stated that he and the defendant were lost and running out of gasoline and had stopped to ask for directions. When asked how they could be running out of gasoline when there were four gasoline stations within one and one-quarter miles of where they were located, Kalil responded that he did not know. When asked why they chose 122 Kingston Road to stop and ask for directions when there were no cars in the driveway, Kalil responded that he did not know.

After obtaining the defendant's consent, Driscoll searched the vehicle, finding some articles of clothing in the backseat, a pair of black gloves on the center console and a screwdriver, pry bar and a hatchet/hammer in the trunk. When the additional police support arrived, Driscoll went back to the house and noticed two sets of footprints in the snow leading from the front of the home to the back of the home and back to the front.[7] He could see where an individual had stopped on the back step and presumably looked into the house through the back door. There did not appear to be any entry into the house.

Driscoll placed Kalil in the backseat of an officer's cruiser and asked the defendant to follow him to the police station. Driscoll drove into the parking area behind the station, and the defendant drove to the front of the station. After parking, Driscoll went to the front of the police station, and the defendant "was standing on the sidewalk in front of the Saab . . . right in front of a row of small shrubbery that's in front of the police station." Driscoll again obtained consent to search the defendant's vehicle, and he seized the hatchet/hammer,

---

[7] Driscoll testified that the owner of the home indicated that there should not have been any footprints in the back of his house.

screwdriver and pry bar. When looking through the interior of the vehicle, the police seized a costume jewelry gemstone. The gemstone was approximately one-quarter inch by one-quarter inch in size and blue or green in color. It was found between the driver's seat and the passenger's seat in the Saab.

The Richmond police later recovered a bag in the bushes in front of the Saab parked in the police department parking lot. Inside the bag were various types of jewelry, including pocket watches, rings and bracelets. The bag contained approximately fifty pieces of jewelry. The bag also had a piece of jewelry with gemstones that matched the gemstone found inside the vehicle.

The Stonington police were notified that the Richmond police department had found individuals and goods that were consistent with the Stonington burglary. Stanton viewed the jewelry obtained by the Richmond police department and identified it as her property.[8] The defendant and Kalil thereafter were arrested by the Stonington police and charged with burglary in the third degree and larceny in the second degree.

The jury found the defendant guilty of burglary in the third degree in violation of § 53a-103 (a) and larceny in the second degree in violation of § 53a-123 (a). The defendant was sentenced on August 5, 2010, to six years imprisonment on the larceny count and five years on the burglary count, to be served concurrently, for a total effective sentence of six years. This appeal followed. Additional facts will be set forth where necessary.

---

[8] Stanton created a list with all of the items taken from her property, and the approximate value of each of the items. The list identified thirty-nine pieces of jewelry and their approximate values as well as money and a telephone that was taken. The total value of the property taken was approximately $8104.50.

434

I

The defendant's first claim on appeal is that after his arrest, but before his conviction, the General Assembly, in P.A. 09-138, amended § 53a-123 to increase the value of property taken for the commission of larceny in the second degree and that the court erred in refusing to apply the ameliorative change to the charge against him. We disagree.

At the time the defendant committed the offense in January, 2009, General Statutes (Rev. to 2009) § 53a-123 provided in relevant part: "(a) A person is guilty of larceny in the second degree when he commits larceny, as defined in section 53a-119, and . . . (2) the value of the property or service exceeds five thousand dollars . . . ."[9] The General Assembly passed P.A. 09-138, entitled, "An Act Concerning Larceny," which, inter alia, increased the value required for an offense constituting larceny in the second degree. At the time of the defendant's conviction, § 53a-123 had been amended to provide in relevant part: "(a) A person is guilty of larceny in the second degree when he commits larceny, as defined in section 53a-119, and . . . (2) the value of the property or service exceeds ten thousand dollars . . . ." General Statutes § 53a-123 (a), as amended by Public Acts 2009, No. 09-138, § 2. The defendant took $8000 worth of goods from the Stonington property. Under the statutory regime at the time of the defendant's conviction, the value of the property taken would no longer qualify for a charge of larceny in the second degree, but, instead, would qualify for larceny in the third degree.[10] See P.A. 09-138, § 3 (a).

[9] General Statutes § 53a-119 provides in relevant part: "A person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner. . . ."

[10] Larceny in the second degree is a class C felony; General Statutes § 53a-123 (c); and larceny in the third degree is a class D felony. General Statutes § 53a-124 (c).

Whether we apply P.A. 09-138 retroactively to crimes committed before its effective date of October 1, 2009, is a question of law over which this court has plenary review. See *State* v. *Nowell*, 262 Conn. 686, 701, 817 A.2d 76 (2003). "Whether to apply [an act] retroactively or prospectively depends upon the intent of the legislature . . . . [There is a presumption of] legislative intent that statutes affecting substantive rights shall apply prospectively only. . . . This presumption in favor of prospective applicability, however, may be rebutted when the legislature clearly and unequivocally expresses its intent that the legislation shall apply retrospectively. . . . We generally look to the statutory language and the pertinent legislative history to ascertain whether the legislature intended that the amendment be given retrospective effect." (Internal quotation marks omitted.) Id., 702.

Generally, a defendant is prosecuted and sentenced under the statutes in effect at the time the defendant commits the offense. See *Davis* v. *Commissioner of Correction*, 133 Conn. App. 458, 465, 37 A.3d 758 (2012). "The legislature has enacted savings statutes as reflected in General Statutes § 54-194, which provides that [t]he repeal of any statute defining or prescribing the punishment for any crime shall not affect any pending prosecution or any existing liability to prosecution and punishment therefor, unless expressly provided in the repealing statute that such repeal shall have that effect; and in General Statutes § 1-1 (t), which provides that [t]he repeal of an act shall not affect any punishment, penalty or forfeiture incurred before the repeal takes effect, or any suit, or prosecution, or proceeding pending at the time of the repeal, for an offense committed, or for the recovery of a penalty or forfeiture incurred under the act repealed." (Internal quotation marks omitted.) Id.

Although the defendant concedes that generally the law in effect at the time of the offense controls sentencing, he posits three arguments in support of his proposition that P.A. 09-138 should apply retroactively in this case. The defendant contends that (1) P.A. 09-138 is an ameliorative statute,[11] (2) the circumstances regarding its enactment demonstrate a legislative intent to apply the provision retroactively and (3) it would be a denial of due process under the state constitution not to apply the provision to the defendant in this case. We address each of these arguments in turn.

## A

The defendant first asserts that P.A. 09-138 is an ameliorative statute and, therefore, should apply retroactively to his case. The amelioration doctrine has not been adopted by Connecticut courts. The doctrine provides that "amendments to statutes that lessen their penalties are applied retroactively . . . ." *State* v. *Graham*, 56 Conn. App. 507, 511, 743 A.2d 1158 (2000); see also *Castonguay* v. *Commissioner of Correction*, 300 Conn. 649, 663, 16 A.3d 676 (2011) (citing *In re Estrada*, 63 Cal. 2d 740, 745–46, 408 P.2d 948, 48 Cal. Rptr. 172 [1965], for proposition that "when [the] legislature has

[11] We note that in the defendant's reply brief, in regard to his amelioration argument, he also argues that P.A. 09-138 is what is known as a "curative act," which "merely clarifies or remedies a perceived defect or misapplication of the statute [and] is not considered a retroactive statute even though it affects events occurring before its enactment, since it is designed to reflect the true meaning of the statute or statutes involved." (Internal quotation marks omitted.) We decline to address this argument because it was raised for the first time in the defendant's reply brief. "Our practice requires an appellant to raise claims of error in his original brief, so that the issue as framed by him can be fully responded to by the appellee in its brief, and so that we can have the full benefit of that written argument. Although the function of the appellant's reply brief is to respond to the arguments and authority presented in the appellee's brief, that function does not include raising an entirely new claim of error." (Internal quotation marks omitted.) *Grimm* v. *Grimm*, 276 Conn. 377, 394 n.19, 886 A.2d 391 (2005), cert. denied, 547 U.S. 1148, 126 S. Ct. 2296, 164 L. Ed. 2d 815 (2006).

amended a statute to mitigate [the] penalty for a crime, [the] new law applies to cases in which [the] defendant committed [the] crime before [the] amendment, but was sentenced after [the] amendment"). In *State* v. *Graham*, supra, 507, this court determined that to adopt the amelioration doctrine essentially would ask the "court to intervene in the legislative process to nullify by judicial fiat the legislature's savings statutes." Id., 511. This court therefore declined to adopt the doctrine. Id. In *Castonguay* v. *Commissioner of Correction*, supra, 663 n.14, the Supreme Court noted that "[t]his court has not previously held that ameliorative changes to criminal statutes apply retroactively and we express no opinion on that question here."

The defendant cites cases from other states that have adopted the amelioration doctrine, which allows amendments to statutes that lessen their penalties to be applied retroactively. See, e.g., *In re Estrada*, supra, 63 Cal. 2d 745–46; *People* v. *Oliver*, 1 N.Y.2d 152, 159–60, 134 N.E.2d 197, 151 N.Y.S.2d 367 (1956). Because our Supreme Court has not expressed an opinion on the amelioration doctrine, and this court has declined to adopt the doctrine in the past, we will not revisit our prior decision on whether ameliorative changes to criminal statutes should apply retroactively.

B

The defendant next argues that the legislative intent behind P.A. 09-138 demonstrates that the legislature intended the provision to apply to an individual tried after the effective date of the enactment, even when the individual committed the offense before the effective date. Specifically, the defendant argues that the provision was meant to adjust the larceny threshold due to twenty-seven years of inflation and that its enactment was meant to benefit the general fund of the state financially.

Generally, the presumption that a statute affecting substantive rights applies prospectively can be rebutted only if the legislature clearly expressed an intent that the statute apply retroactively. *State* v. *Nowell*, supra, 262 Conn. 702. In order to decipher if the legislature evinced such intent, we look not only at the statutory language, but also at the pertinent legislative history. Id.

In the present case, the offense occurred on January 27, 2009. Public Act 09-138 was signed by Governor M. Jodi Rell on June 25, 2009. The text of the act provides that it is effective October 1, 2009.[12] The plain language of P.A. 09-138 does not contain express language that indicates that the provision is to be applied retroactively. By stating that the provision becomes effective October 1, 2009, without any other express language referring to retroactivity, the legislature evinced its intent that the provision be applied prospectively only, on and after October 1, 2009. See *Davis* v. *Commissioner of Correction*, supra, 133 Conn. App. 467 ("[t]he presumption that [a statute] has only prospective effect can be overcome only by a clear and unequivocal expression of legislative intent that the statute shall apply retrospectively" [internal quotation marks omitted]). Had the legislature intended the act to apply to those who had committed larceny prior to October 1, 2009, but had yet to be sentenced, it could have explicitly used language to evince such intent. See *State* v. *Nowell*, supra, 262 Conn. 703.

We further conclude that there is nothing in the legislative history to indicate that "the legislature clearly and unequivocally intended" for this provision to apply retroactively to crimes committed before its enactment.

---

[12] Number 09-138, § 2, of the 2009 Public Acts provides in relevant part: "Section 53a-123 of the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2009*) . . . ." (Emphasis in original.)

(Internal quotation marks omitted.) Id., 702. In the judiciary committee's joint favorable report, the reason stated for the bill is that it "would adjust the monetary values utilized in the larceny statutes to more accurately reflect the actual values today. The values, last updated in 1982, are adjusted using the consumer price index." Judiciary Committee Report, House Bill No. 6576, January 2009 Sess. We therefore conclude that there is no clear and unequivocal intention demonstrated by the legislature to allow for the provision to be applied retroactively.

The defendant, however, posits two arguments to support his contention that the legislative history indicates that the legislature intended for the provision to apply retroactively. The defendant first cites the judiciary committee's joint favorable report to support his contention. He argues that the report indicates that the provision was meant to correct the larceny amounts to account for twenty-seven years of inflation. He also points to the report's reference to Renee Cimino, of the office of chief public defender, and Conrad Ost Seifert, then president elect of the Connecticut Criminal Defense Lawyers Association, who both supported the bill due to its impact on criminal defendants and the penalties that potentially could be imposed. This short report, which simply references the opinions of two individuals involved in criminal defense, does not demonstrate that the legislature "clearly and unequivocally intended" for this provision to apply retroactively. The existence of legislative intent to increase the larceny values to account for inflation, in and of itself, is not sufficient to demonstrate an intent for the provision to apply retroactively.

Second, the defendant contends that the enactment of the provision was designed to benefit financially the general fund of the state and, therefore, should apply retroactively to his case. The defendant cites the fiscal

note authored by the General Assembly's office of fiscal analysis to support his argument.[13] He contends that as of 2009, it cost the state a minimum of approximately $44,165 to incarcerate a defendant each year, and because he was sentenced for one year more than he could have been sentenced for a third degree larceny conviction, it will cost the state an additional $44,165 to incarcerate him for six years.

As we previously have recognized, "the summaries prepared by the office of legislative research expressly provide: The following fiscal impact statement and bill analysis are prepared for the benefit of members of the General Assembly, solely for purposes of information, summarization and explanation and do not represent the intent of the General Assembly or either house thereof for any purpose. . . . Although the comments of the office of legislative research are not, in and of themselves, evidence of legislative intent, they properly may bear on the legislature's knowledge of interpretive problems that could arise from a bill." (Citations omitted; internal quotation marks omitted.) *Harpaz* v. *Laidlaw Transit, Inc.*, 286 Conn. 102, 124 n.15, 942 A.2d 396 (2008).

The fiscal impact statement is not indicative of legislative intent. As we have stated in prior cases, those

---

[13] The fiscal note provides in relevant part: "The bill increases the threshold amounts for classes of larceny. Based on this adjustment, offenders would face lower maximum penalties than provided under current law. For example, any person convicted of stealing $1,000 worth of goods or services may receive a prison term of up to 5 years under current law whereas the bill provides for a maximum prison term of 1 year for such a theft. . . . To the extent that these changes decrease the maximum criminal penalties to which larceny offenders are exposed, a potential savings related to probation supervision and incarceration (in addition to a potential revenue loss from criminal fines) exists. On average, it costs the state $3,736 to supervise an offender on probation in the community as compared to $44,165 to incarcerate the offender." (Citation omitted.) Office of Fiscal Analysis, Connecticut General Assembly, Fiscal Note, House Bill No. 6526, An Act Concerning Larceny.

statements are prepared for the members of the General Assembly and are not indicative of legislative intent. Further, the statement in the present case simply notes that the change in the larceny provisions will save the state money if an individual is incarcerated for a lesser period of time. This cost savings, however, is not the basis for the passing of this provision. Furthermore, merely because the changes in the statute might save the state money does not support the conclusion that the legislature intended to apply the provision retroactively to crimes committed before the provision became effective, when it expressly provided an effective date of October 1, 2009.

In sum, the language of P.A. 09-138 and its legislative history do not indicate that the legislature intended the provision to apply retroactively. Further, as outlined previously, our legislature has enacted savings clause provisions that govern prior offenses. "Our courts have repeatedly held that these savings statutes preserve all prior offenses and liability therefor so that when a crime is committed and the statute violated is later amended or repealed, defendants remain liable under the revision of the statute existing at the time of the commission of the crime." *State* v. *Graham*, supra, 56 Conn. App. 511. We conclude that P.A. 09-138 does not apply retroactively to the defendant's case.

C

The defendant's third argument is that, unless the legislative intent clearly indicates that an amended provision not be applied retroactively, the punishment is not warranted by law and, therefore, the failure to apply the provision retroactively violates article first, § 9, of the constitution of Connecticut.[14] Specifically, the

[14] Article first, § 9, of the Connecticut constitution provides: "No person shall be arrested, detained or punished, except in cases clearly warranted by law."

defendant argues that "[t]o be consistent with [article first], § 9, then, the [c]ourt should conclude that unless otherwise clearly indicated by the [l]egislature, 'an ameliorating amendment to a criminal statute is reflective of the [l]egislature's determination that the lesser punishment is the appropriate penalty for the offense.' "

Although the defendant contends that his claim is preserved, in the alternative, he also seeks review pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). After reviewing the record, we conclude that the defendant's constitutional claim was not preserved at trial. On March 10, 2010, the defendant's trial counsel asked the court to strike count two of the information, which charged the defendant with having committed larceny in the second degree. The defendant's counsel argued that "at this point in time the larceny three is anything up to $10,000, that the evidence in this case is approximately $8000 of items." He did not offer the court any law as to why the change in the law should benefit the defendant.[15] On the basis of this record, we conclude that the defendant did not raise his state constitutional claim before the trial court, and we therefore proceed under *Golding*.

Under *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is

[15] The entire colloquy was as follows:

"[Defense Counsel]: . . . I'm asking that the count two of the—of my client's information be stricken. It's my position that at this point in time the larceny three is anything up to $10,000, that the evidence in this case is approximately $8000 of items. I do—I do see at the time of January 27, 2009, the statute was anything above $5000 to below $5000 for larceny three.

"The Court: Why shouldn't that be three?

"[Defense Counsel]: The change in law goes to the benefit of the defendants.

"The Court: Do you have any law?

"[Defense Counsel]: I do not. . . .

"The Court: Your application is denied."

adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." (Emphasis in original.) *State* v. *Golding*, supra, 213 Conn. 239–40. We conclude that the record is adequate to review the defendant's claim. The defendant's claim must fail, however, under the third prong. Having already determined that P.A. 09-138 does not apply retroactively to crimes committed before the act was enacted, we find that the defendant has not demonstrated that the alleged constitutional violation clearly exists.

II

The defendant's next claim is that, in the absence of a jury instruction on accessory liability, there was insufficient evidence presented to prove that the defendant committed burglary in the third degree. We are not persuaded.

"In reviewing a sufficiency of the evidence claim, we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [trier of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . In evaluating evidence, the trier of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The trier may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and

logical. . . . This does not require that each subordinate conclusion established by or inferred from the evidence, or even from other inferences, be proved beyond a reasonable doubt . . . because this court has held that a [trier's] factual inferences that support a guilty verdict need only be reasonable. . . .

"[A]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the trier, would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [trier's] verdict of guilty. . . . Furthermore, [i]n [our] process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence." (Internal quotation marks omitted.) *State* v. *Butler*, 296 Conn. 62, 76–77, 993 A.2d 970 (2010).

To convict the defendant of burglary in the third degree, the state was required to prove beyond a reasonable doubt that the defendant "enter[ed] or remain[ed] unlawfully in a building with intent to commit a crime therein." General Statutes § 53a-103 (a). "A person 'enters or remains unlawfully' in or upon premises when the premises, at the time of such entry or remaining, are not open to the public and when the actor is not otherwise licensed or privileged to do so." General Statutes § 53a-100 (b).

The defendant argues that there was insufficient evidence to support his conviction of burglary in the third

degree because the state did not prove that the defendant actually entered the Stonington property, which is an element of the charged offense. The defendant contends that the jury would have had to resort to impermissible speculation to conclude that both the defendant and Kalil entered the residence, instead of only one of them. We disagree.

In proving that the defendant entered the Stonington property unlawfully, the state may rely upon direct or circumstantial evidence. *State* v. *Sherman*, 127 Conn. App. 377, 386, 13 A.3d 1138 (2011). "[I]t does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct." (Internal quotation marks omitted.) Id.

In this case, the jury reasonably could have found that the car that was stopped by Driscoll in Rhode Island was the same car that was parked outside of the Stonington property. The defendant and Kalil were stopped in a black Saab convertible with Massachusetts license plates. The vehicle matched the description of the vehicle Wesson observed outside of the Stonington property. Further, the tapestry bag with jewelry taken from the Stonington property was found in the bushes outside of the Richmond police station, and a gemstone matching that of a piece of jewelry found in the bag was located in the Saab. Taken together, the jury reasonably could have determined that the black Saab convertible that was stopped by Driscoll in Rhode Island was the same vehicle observed by Wesson parked in front of the Stonington property. Further, because the vehicle was registered to the defendant's sister, the jury could have inferred that the defendant was at the Stonington property.

"[I]n sustaining [burglary] convictions based entirely on circumstantial evidence, this court has relied on

evidence that the defendant was at or near the residence at about the time of the burglary and that the defendant was in possession of items stolen from the residence thereafter." Id., 387–88. In *State* v. *Correa*, 57 Conn. App. 98, 748 A.2d 307, cert. denied, 253 Conn. 908, 753 A.2d 941 (2000), the defendant argued that there was insufficient evidence for his conviction of burglary in the third degree because the state had not presented evidence that he entered the victim's residence. Id., 108. On appeal, this court noted that there was evidence that a car belonging to the victim's girlfriend was parked near the residence prior to the burglary, the defendant had used the car on the day of the burglary, the defendant matched a witness description of an individual seen in the victim's driveway at about the time of the burglary and that some of the victim's jewelry was found after the burglary in the apartment where the defendant was staying. Id., 100–101. This court determined that the cumulative weight of the evidence was sufficient to demonstrate that the defendant unlawfully entered the victim's residence. Id., 110; see also *State* v. *Spikes*, 111 Conn. App. 543, 555–56, 961 A.2d 426 (2008) ("[i]n the present case, on the basis of evidence that the defendant was seen at or near 291 Church Street at about the time of the burglary and that he had on his person at the time he was arrested some of the jewelry stolen from the premises, we conclude that the jury reasonably could have found that he illegally entered 291 Church Street on February 19, 2005, and stole that jewelry"), cert. denied, 291 Conn. 901, 967 A.2d 114, cert. denied, 558 U.S. 898, 130 S. Ct. 249, 175 L. Ed. 2d 170 (2009).

In the present case, the jury reasonably could have inferred that the defendant unlawfully entered the Stonington property. As already discussed, the jury reasonably could have determined that the defendant was at the Stonington property during the time of the burglary and that the vehicle he was driving was parked in front

of the property. There was evidence that the door frame of the Stonington property had been manipulated by some type of tool, and a screwdriver, hatchet/hammer and pry bar were found in the trunk of the Saab. Although there was no direct evidence of the defendant's physical unlawful entry, items taken from the Stonington property were later located in Rhode Island after the defendant and Kalil were stopped. After being stopped by Driscoll, there was a period of time when the defendant was unobserved by the Richmond police, as he drove to the front of the police station instead of following Driscoll to the rear of the station. Afterward, the Richmond police located a tapestry bag in the bushes outside of the police station, right in front of where the defendant parked the Saab. This tapestry bag contained items that were stolen from the Stonington property. Further, the Richmond police later found a gemstone matching a piece of jewelry stolen from the Stonington property in the Saab. On the basis of this evidence and the inferences reasonably drawn therefrom, the jury could have found that the defendant entered the Stonington property unlawfully.

Although there was only one defendant in *State* v. *Correa*, supra, 57 Conn. App. 98, and two in the present case, the jury in the present case reasonably could have inferred that the defendant and Kalil worked together to commit the Stonington burglary. Wesson observed a car matching a description of the car that was stopped in Rhode Island parked in front of the Stonington property and two individuals leaving the scene in the vehicle. She observed the vehicle twice; the first time there was nobody in or around the vehicle. On the basis of this testimony, the jury could have inferred that at one point both men were away from the vehicle and that it was during this time that the men entered the Stonington property. Further, because both the defendant and Kalil were observed by Driscoll peering into the house in

Rhode Island, the jury reasonably could have inferred that such action was in preparation for jointly entering the Rhode Island property. While on the Richmond property, both the defendant and Kalil were away from the vehicle, as was true in Stonington, and actively were involved in peering into the property when the homeowners were not home. On the basis of the fact that the men were working together in Rhode Island, the jury reasonably could have inferred that they worked together in the Stonington burglary as well. Although there was no direct evidence that both the defendant and Kalil unlawfully entered the Stonington property, the jury was entitled to infer through the cumulative circumstantial evidence outlined previously that the defendant unlawfully entered the property.

The defendant argues that there was only one set of footprints in the snow outside of the Stonington property, thereby demonstrating that only one person arguably entered the Stonington property. He further argues that Wesson observed the vehicle in two different locations, and because the vehicle was moved, this tended to show that only one individual entered the Stonington property. We note again, however, that "[o]n appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [trier's] verdict of guilty." (Internal quotation marks omitted.) *State* v. *Butler,* supra, 296 Conn. 77. After construing the evidence in the light most favorable to sustaining the verdict, we conclude that the jury reasonably could have found the defendant guilty of burglary in the third degree.

III

The defendant's last claim on appeal is that the trial court erred in not granting the defendant's renewed

motion to sever the trials of the defendant and Kalil, after outbursts by Kalil before the start of the trial. We disagree.

The following additional facts are relevant to the resolution of the defendant's claim. The state filed a motion to consolidate the defendant's case with that of Kalil. Despite opposition by the defendant's counsel, the court granted the state's motion. As the jury was brought out on the first day of trial, Kalil exclaimed: "Ladies and gentlemen of the jury, I would like to announce that I am being forced to proceed in trial against my will. My attorney . . . Richard Kelly is incompetent, and I am threatened to proceed in this matter. I should not be allowed to continue." After Kalil's outburst, the judge removed the jury from the courtroom. The judge advised Kalil that he could not disrupt the proceedings or else he would be removed. After Kalil's outburst, the defendant's counsel orally moved to sever the trials, arguing that "we have a situation where, I'm afraid, Mr. Kalil['s] behavior will spill over or reflect upon my client's situation, so we renew our motion to sever at this time." The court denied the motion.

The jury was brought into the courtroom again, and Kalil exclaimed, "[The defendant] and I are being held— we are being held. I will not be . . . held—and forced into a legal proceeding on something we didn't do." The court told Kalil to stop talking and to take a seat and then advised the jury that "you will disregard the statements and the actions of Mr. Kalil." Kalil again stated, "[The defendant] and I are being held and forced into a legal proceeding on something we didn't do." The court again advised Kalil to stop talking and stated to the jury: "Ladies and gentlemen, you will disregard the statements and the outburst by Mr. Kalil. They will play no role in your determination in the case of state

versus Albert Kalil and state of Connecticut versus [the defendant]."

After the first three witnesses testified for the prosecution, the defendant's counsel again renewed his motion to sever the trials. He argued: "Mr. Kalil got up and had another outburst and then announced they've been in jail for another year or almost a year, had a bond placed on them. . . . And sits and taps on the table several other times . . . . I mean, we, as in every case . . . we try to make sure the jury doesn't see shackles and dressed in the prison uniforms because of the prejudice of someone being in jail. He then announced to the entire jury while the jury was present that that's where they've been, and this is the situation for both of them. So, I think his actions are now beginning to severely prejudice my client." The court stated that it had given a curative instruction and that it had been speaking at the same time as Kalil, so the jury likely was unable to hear Kalil. The court therefore denied the motion.

During the court's charge to the jury at the conclusion of closing arguments, the court stated: "Any statements or disruptions made at the beginning of the trial by the defendant Albert Kalil are to be disregarded by you. They are not evidence and are not to be considered by you in evaluating the evidence in this case with respect to either Albert Kalil or [the defendant]."

"[W]hether to consolidate or sever the trials of defendants involved in the same criminal incident lies within the sound discretion of the trial court. . . . A separate trial will be ordered where the defenses of the accused are antagonistic, or evidence will be introduced against one which will not be admissible against others, and it clearly appears that a joint trial will probably be prejudicial to the rights of one or more of the accused. . . . [T]he phrase prejudicial to the rights of the

[accused] means something more than that a joint trial will probably be less advantageous to the accused than separate trials." (Internal quotation marks omitted.) *State* v. *Booth*, 250 Conn. 611, 620, 737 A.2d 404 (1999), cert. denied sub nom. *Brown* v. *Connecticut*, 529 U.S. 1060, 120 S. Ct. 1568, 146 L. Ed. 2d 471 (2000).

"The test for the trial court is whether substantial injustice is likely to result unless a separate trial be accorded. . . . [W]e will reverse a trial court's ruling on joinder only where the trial court commits an abuse of discretion that results in manifest prejudice to one or more of the defendants." (Citation omitted; internal quotation marks omitted.) *State* v. *Ortiz*, 252 Conn. 533, 575–76, 747 A.2d 487 (2000).[16]

The defendant contends that "after the jurors were informed by Albert Kalil that he and the defendant were being 'held' in jail until trial began, the defendant's presumption of innocence and right to a rigorous application of the proof beyond a reasonable doubt standard were both vitiated . . . ." Accordingly, the defendant argues that the court erred in denying his motions to sever his trial from Kalil's trial.

In cases involving a defendant's motion for a mistrial when reference was made to pretrial incarceration, our

---

[16] We note that our Supreme Court recently decided *State* v. *Payne*, 303 Conn. 538, 34 A.3d 370 (2012), in which it rejected the "blanket presumption in favor of joinder" in cases involving multiple informations against the same defendant. Id., 549. The *Payne* decision did not indicate whether its holding would apply in cases involving the joinder of multiple defendants; however, we recognize that the same issues addressed in *Payne* may be present in such cases. In *Payne*, however, the court concluded that "[d]espite our reallocation of the burden when the trial court is faced with the question of joinder of cases for trial, the defendant's burden of proving error on appeal when we review the trial court's order of joinder remains the same." Id., 550 n.11. Therefore, for the purposes of this appeal, our standard of review remains the same, and we seek to determine whether joinder resulted in manifest prejudice to the defendant. *State* v. *Ortiz*, supra, 252 Conn. 575–76.

courts have stated that "[n]ot every reference to a defen-
dant's pretrial incarceration is grounds for a mistrial.
. . . There is nothing sacrosanct about a defendant's
pretrial incarceration." (Citation omitted; internal quo-
tation marks omitted.) *State* v. *Tucker*, 226 Conn. 618,
628, 629 A.2d 1067 (1993). In fact, courts have held that
a curative instruction was a reasonable means to cure
any potential prejudice, when the defendant was on
trial for a serious crime and it was reasonable to believe
that the jury could have suspected that the defendant
at some time before trial was incarcerated. See *State*
v. *McCleese*, 94 Conn. App. 510, 515, 892 A.2d 343 (State's
inadvertent question regarding the defendant's pretrial
incarceration did not deprive defendant of fair trial
where "the defendant was on trial for murder, conspir-
acy to commit murder and assault." This court con-
cluded that "[i]t is reasonable to believe that the jury
could have suspected that the defendant, at some point
before trial, had been incarcerated."), cert. denied, 278
Conn. 908, 899 A.2d 36 (2006); *State* v. *Marshall*, 87
Conn. App. 592, 604–605, 867 A.2d 57 (prosecutor's two
references to "lockup" did not deprive defendant of
fair trial, where jury was aware of defendant's prior
convictions and that he was on trial for serious crimes
because "it would not be surprising for the jurors to
have knowledge of or suspicions regarding the defen-
dant's incarceration"), cert. denied, 273 Conn. 925, 871
A.2d 1032 (2005).

In the present case, the record indicates that at the
time of at least one of the outbursts by Kalil, the court
was speaking at the same time and therefore reasonably
could have believed that the jury could not hear what
Kalil stated. "Substantial prejudice is more than disad-
vantage and the formidable task of demonstrating an
abuse of discretion and that a joint trial resulted in
substantial prejudice falls to the defendant." (Internal
quotation marks omitted.) *State* v. *Thompson*, 81 Conn.

App. 264, 284, 839 A.2d 622, cert. denied, 268 Conn. 915, 847 A.2d 312 (2004). These statements in and of themselves are not sufficient to demonstrate that the defendant was prejudiced by the joinder of his trial with that of Kalil. In addition, the defendant and Kalil were on trial for burglary and larceny, both of which are serious crimes. It would be reasonable to believe that the jury might have suspected that the defendant and Kalil were incarcerated at some time before trial. Accordingly, we conclude that Kalil's outbursts at the beginning of trial did not result in substantial injustice resulting in manifest prejudice to the defendant.

Moreover, the risk of prejudice to the defendant was mitigated by the court's instructions to the jury to disregard Kalil's statements. "Cautionary instructions to the jury concerning what evidence may be considered against which defendant can often alleviate any potential prejudice. The spillover effect . . . usually is best avoided by precise instructions to the jury on the admissibility and proper uses of the evidence introduced by the government." (Internal quotation marks omitted.) *State* v. *Jackson*, 73 Conn. App. 338, 368, 808 A.2d 388, cert. denied, 262 Conn. 929, 814 A.2d 381 (2002). "The jury [is] presumed to follow the court's directions in the absence of a clear indication to the contrary." (Internal quotation marks omitted.) *State* v. *Booth*, supra, 250 Conn. 626. In the present case, the court gave a curative instruction to the jury immediately after Kalil's outbursts and again in its charge to the jury. Accordingly, we conclude that the court did not abuse its discretion in denying the defendant's motions to sever.

The judgment is affirmed.

In this opinion the other judges concurred.