JOHN A. CURRAN III, ADMINISTRATOR (ESTATE OF LEEANN CURRAN), ET AL. *v.* SHERRY L. KROLL ET AL.
(AC 29792)

Flynn, C. J., and Harper and Hennessy, Js.

Argued September 10—officially released December 15, 2009

*Kathleen L. Nastri*, with whom was *Cynthia C. Bott*, for the appellant (substitute plaintiff).

*Michael G. Rigg*, with whom were *Donna R. Zito*, and, on the brief, *Stephen V. Manning*, for the appellees (named defendant et al.).

*Opinion*

FLYNN, C. J. The substitute plaintiff, Ryan P. Curran (Ryan), the successor administrator of the estate of Leeann Curran (decedent), appeals from the judgment of the trial court directing a verdict in this medical malpractice case in favor of the defendants, Sherry L. Kroll, a physician, and the Medical Center of Northeast Connecticut, LLP, Kroll's medical office.[1] On appeal, the plaintiff claims that the court improperly granted the defendants' motion for a directed verdict after concluding that there was no evidence that Dr. Kroll breached the standard of care in her treatment of the decedent. We reverse the judgment of the trial court.

The following facts and inferences, construed in the light most favorable to the plaintiff, reasonably are taken from the record. See *Levesque* v. *Bristol Hospital, Inc.*, 286 Conn. 234, 253, 943 A.2d 430 (2008). The decedent died on June 8, 2002, as a result of blood clots in her lungs that likely originated in her left thigh, traveled through her venous system and her heart and lodged in her lungs. The official cause of her death was determined to be bilateral pulmonary emboli caused by deep vein thrombosis.[2]

---

[1] During the pendency of the lawsuit, the plaintiff John A. Curran III, the husband of Leeann Curran, died, and Ryan P. Curran, their son, was substituted as the administrator of Leeann Curran's estate. We refer in this opinion to the substitute plaintiff, Ryan P. Curran, as the plaintiff.

In addition to Kroll and the Medical Center of Northeast Connecticut, LLP, other defendants were named in the complaint, but the action was withdrawn as to them prior to trial. We therefore refer in this opinion to Kroll and the Medical Center of Northeast Connecticut, LLP, as the defendants.

[2] A deep vein thrombosis is a "blood clot in the deep [vein] system of the legs," which occurs primarily in the thigh and the calf. If one of the clots breaks off from the vein where it has formed and travels through the venous

On May 6, 2002, approximately one month before her death, the decedent, a forty-five year old woman, attended a scheduled office visit with her primary care physician, Dr. Kroll, at which time the decedent complained of menopausal symptoms, including mood swings, hot flashes, dysmenorrhea (painful periods), and menometrorrhagia (irregular and heavy periods). To help alleviate those symptoms, Dr. Kroll prescribed Desogen, an oral contraceptive or birth control pill, which was dispensed to the decedent in one of its generic forms, Apri, by her pharmacy. Both medications substantially are the same. Near the end of May, the decedent told her mother, Kathy Stilwell, that she "felt terrible" and did not want to continue taking the pills because she was feeling worse than before she started taking them. The decedent also told Stilwell that she had telephoned Dr. Kroll about this, but the doctor told her to continue on the medication, which she did. Dr. Kroll's office had no record of the decedent having made this telephone call, however. At some point in time after the decedent's May 6, 2002 office visit, the defendants lost or misplaced her medical chart, which later was re-created, in part, from a computer file in preparation for trial. Writings, such as some handwritten notations from Dr. Kroll, the decedent's self-prepared patient information sheet, reports from other doctors, handwritten notations from nurses or assistants in Dr. Kroll's office and other items, however, could not be reproduced and were lost. Dr. Kroll did testify, however, that it was her practice to dictate the results of a patient's examination and her recommendations, which then were stored electronically.

On June 6, 2002, the decedent and Stilwell attended a meeting together. The decedent had considerable leg

system, through the heart, lodging in the pulmonary artery, it causes what is known as a pulmonary embolism, or a blood clot in the lung. "Bilateral pulmonary emboli" refers to blood clots in both lungs.

pain, however, and had to leave the meeting because of her discomfort. The decedent had no idea what was causing her pain. Although she went to work the next day, she had to leave work early due to continuing, significant leg pain. She speculated to Stilwell that perhaps she had done something to herself such as pull a muscle, but "she truly had no idea what was wrong with her." The decedent also told her husband that she had pain in her groin and that she could not figure out why. She speculated to him that perhaps she had pulled a muscle. She continued to complain about the pain through the evening of June 7, 2002. She and her husband were babysitting their two grandchildren that weekend. During the night, the decedent's son, Ryan, heard her grunting in pain as the decedent's husband helped her get from their bedroom down the stairs. She was continuing to experience leg pain. Ryan asked if they needed help, but the decedent's husband declined, explaining that he was taking the decedent downstairs so that she could elevate her leg. The decedent stayed on the couch because of the pain. Ryan left for work at approximately 4 a.m. and kissed the decedent good-bye as she lay on the couch. The decedent reassured him that she was okay.

At approximately 6 a.m. on the morning of June 8, 2002, the decedent's seven year old granddaughter woke the decedent's husband to tell him that the decedent had fallen; the granddaughter was quite upset. The decedent had fallen and hit her head in the bathroom. Her husband helped the decedent get onto the couch, and he telephoned 911. The decedent complained to her husband that she was unable to breathe. The Plainfield fire department responded quickly, as did the Canterbury fire department. Members thereof began providing assistance to the decedent, but she lost consciousness and stopped breathing. They continued in their attempts to revive her while she was taken by

ambulance to a hospital. The decedent never regained consciousness. The cause of the decedent's death was bilateral pulmonary emboli caused by deep vein thrombosis.

In his third amended complaint, the plaintiff alleged a claim of medical malpractice against the defendants, claiming that Dr. Kroll was negligent in failing to advise the decedent of the risks of her recommended treatment of birth control pills and in failing to inform the decedent of the signs and symptoms associated with such risks. The parties agreed that the standard of care requires a treating physician to provide such warnings and instruction to a patient. After the plaintiff presented his evidence, the defendants moved for a directed verdict. Because the defendants' medical expert, Peter Schnatz, a board certified internist and obstetrician-gynecologist, was available to testify only on February 28, 2008, the court permitted his testimony before hearing the motion for a directed verdict. Following argument on the motion, the court concluded that there was no evidence that Dr. Kroll had breached the standard of care and that a failure to warn claim could not be based solely on an inference that might be drawn from the decedent's failure to seek help. Accordingly, the court directed a verdict in favor of the defendants and rendered judgment accordingly. This appeal followed.

The plaintiff claims that the court improperly granted the defendants' motion for a directed verdict and that the case should have stayed in the hands of the jury. The defendants argue that the court properly directed a verdict because the plaintiff failed to establish a "prima facie case that Dr. Kroll failed to advise the decedent of the appropriate signs and symptoms and risks associated with taking oral contraceptives." We agree with the plaintiff.

Initially, we set forth the legal principles that govern our review of the plaintiff's claim. "The standards for

appellate review of a directed verdict are well settled. Directed verdicts are not favored. . . . A trial court should direct a verdict only when a jury could not reasonably and legally have reached any other conclusion. . . . In reviewing the trial court's decision to direct a verdict in favor of a defendant we must consider the evidence in the light most favorable to the plaintiff. . . . Although it is the jury's right to draw logical deductions and make reasonable inferences from the facts proven . . . it may not resort to mere conjecture and speculation. . . . A directed verdict is justified if . . . the evidence is so weak that it would be proper for the court to set aside a verdict rendered for the other party." (Internal quotation marks omitted.) *Levesque* v. *Bristol Hospital, Inc.*, supra, 286 Conn. 253. "A verdict may be directed . . . where the claim is that there is insufficient evidence to sustain a favorable verdict." (Internal quotation marks omitted.) *Beale* v. *Yale-New Haven Hospital*, 89 Conn. App. 556, 566, 874 A.2d 259 (2005).

"Negligence involves the violation of a legal duty [that] one owes to another, in respect to care for the safety of the person or property of that other." *Sharkey* v. *Skilton*, 83 Conn. 503, 508, 77 A. 950 (1910). The "essential elements of a cause of action in negligence are well established: duty; breach of that duty; causation; and actual injury." (Internal quotation marks omitted.) *Jagger* v. *Mohawk Mountain Ski Area, Inc.*, 269 Conn. 672, 687 n.13, 849 A.2d 813 (2004). "[W]hether the plaintiff has established a prima facie case is a question of law, over which our review is plenary." (Internal quotation marks omitted.) *John H. Kolb & Sons, Inc.* v. *G & L Excavating, Inc.*, 76 Conn. App. 599, 605, 821 A.2d 774, cert. denied, 264 Conn. 919, 828 A.2d 617 (2003).

In this case, in which the court directed a verdict after concluding that the plaintiff had failed to provide any evidence, either direct or circumstantial, from

which the jury reasonably could have concluded that Dr. Kroll had breached the standard of care by failing to advise the decedent of the signs and symptoms associated with the risks of birth control pills, we need only determine whether the court properly concluded that such evidence was absent from the case. We agree that there was no direct evidence that Dr. Kroll breached the standard of care; this was so because the person who could have provided such evidence was dead. We disagree, however, that there was no circumstantial evidence that could have led to a reasonable inference if the jury had chosen to credit such evidence. "[T]here is no distinction between direct and circumstantial evidence [so] far as probative force is concerned . . . . In fact, circumstantial evidence may be more certain, satisfying and persuasive than direct evidence." (Internal quotation marks omitted.) *Goldstar Medical Services, Inc.* v. *Dept. of Social Services*, 288 Conn. 790, 834, 955 A.2d 15 (2008). After thoroughly reviewing the record, we conclude that there was evidence to support a reasonable inference that Dr. Kroll had not advised the decedent in accordance with the proper standard of care.

Unlike Aristotelian and Thomistic logic, law does not demand metaphysical certainty in its proofs. In law, we recognize three principal proofs: beyond a reasonable doubt, which is the very high burden in a criminal case; clear and convincing evidence, required to prove fraud and certain other claims, which equates to a very high probability; and preponderance of the evidence, applied to civil claims generally, which means it is more probable than not.[3] None of these varying proofs require absolute certainty.

---

[3] "The function of the burden of proof employed by the court is to allocat[e] the risk of error between the litigants and indicat[e] the relative importance of the ultimate decision. . . . For example, the proof beyond a reasonable doubt standard implies that the party on whom that burden is imposed should bear almost the entire risk of error. . . . Proof by clear and convincing evidence is an intermediate standard generally used in civil cases involv-

To meet one's burden of proof, evidence is necessary. This evidence comes in two forms, direct and circumstantial. "The basic distinction between direct and circumstantial evidence is that in the former instance the witnesses testify directly of their own knowledge as to the main facts to be proved, while in the latter case proof is given of facts and circumstances from which the jury may infer other connected facts which reasonably follow, according to common experience." 29 Am. Jur. 2d 329, Evidence § 313 (1994). "Proof of a fact by the use of circumstantial evidence usually involves a two-step process. A fact is first established by direct evidence, which is ordinarily eyewitness or other direct testimony. That direct evidence can serve as a basis from which the jury infers another fact. Thus, the direct evidence may operate as circumstantial evidence from which a fact is inferred by the jury." *State* v. *Sullivan*, 11 Conn. App. 80, 97, 525 A.2d 1353 (1987), citing *State* v. *Rome*, 64 Conn. 329, 334, 30 A. 57 (1894). "When the necessity to resort to circumstantial evidence arises either from the nature of the inquiry or the failure of direct proof, considerable latitude is allowed in its reception." 29 Am. Jur. 2d 331, Evidence § 315 (2008).

"An inference is a factual conclusion that can rationally be drawn from other facts. If fact A rationally supports the conclusion that fact B is also true, then B may be *inferred* from A. The process of drawing inferences based on a rough assessment of probabilities is what makes indirect or circumstantial evidence relevant at trial. If the inference (fact B from fact A) is strong enough, then fact A is relevant to prove fact B.

ing allegations of fraud or some other quasi-criminal wrongdoing, or when particularly important individual rights are involved. . . . The preponderance of the evidence standard indicates that the litigants should share equally the risk of error . . . because the interests at stake have roughly equal societal importance." (Citations omitted; internal quotation marks omitted.) *State* v. *Davis*, 229 Conn. 285, 293–94, 641 A.2d 370 (1994).

Inferences are by their nature permissive, not manda-
tory: although the fact proved rationally supports the
conclusion the offering party hopes will be inferred,
the factfinder is free to accept or reject the inference."
(Emphasis in original.) 1 C. Fishman, Jones on Evidence
(1992) § 4:1, pp. 299–300; see also D. Faulkner & S.
Graves, Connecticut Trial Evidence Notebook (2d Ed.
2008 Rev.) I-14. Much has been written about the jury's
ability to draw inferences, but, as explained by Profes-
sor McCormick, "in few areas of the law have so many
words been spoken by the courts with so little convic-
tion." 2 C. McCormick, Evidence (5th Ed. 1999) § 338,
p. 418.

Just because a jury could, but is not required to,
draw an inference does not mean that it is resorting to
speculation. "Inferences are based on common experi-
ence and probability. Reasonable inferences permit the
jury to find the inferred fact without direct proof of
that fact. Direct evidence of a fact or facts will often
give rise to circumstance evidence of other fact or facts.
Such inferences, if reasonable, permit the fact finder
to find the inferred fact without direct proof of that
fact. C. Tait & E. Prescott, Connecticut Evidence (4th
Ed. 2008) § 3.12.3" (a), p. 123.

"A trier is entitled to draw all reasonable and logical
inferences based on the facts proved. . . . Inferences
should be based on probabilities, not possibilities, sur-
mise, or conjecture. . . . To state a truism, the only
kind of inference the law recognizes is a reasonable
one. . . . Connecticut does not subscribe to the oft-
repeated rule that an inference cannot be based on
an inference. Successive inferences are permissible if
justified by the facts. . . . Thus, one inference can be
founded upon facts whose determination is the result
of other inferences. . . . The only question is whether
the successive inferences are rationally justified by the
facts." (Citations omitted.) Id.,§ 4.3.1, p. 139; see *State*

v. *Crafts*, 226 Conn. 237, 245, 627 A.2d 877 (1993)
("[t]here is, in fact, no rule of law that forbids the resting
of one inference upon facts whose determination is the
result of other inferences" [internal quotation marks
omitted]).

The following additional facts are relevant to our
analysis. Dr. Kroll prescribed an oral contraceptive or
birth control pill to the decedent on May 6, 2002, to
help alleviate menopausal symptoms. Dr. Kroll testified
that her training included information about the risks
and side effects of birth control pills. She further testi-
fied that the risks of "blood clots are associated with
the older formulations of birth control pills. The newer
[formulation] of pills were designed specifically to try
to reduce the risk. So, the data that is available is unclear
to the degree that the risk was still present." She then
acknowledged that "one of the risks associated with
birth control pills can be blood clots," but she also
stated that she did not know if that same risk was
associated with Desogen because the studies citing an
increased risk were based on the older formulations of
birth control pills.

Despite stating that she did not know if the risks
were associated with Desogen, Dr. Kroll later testified
that she "[d]efinitely" would have advised the decedent
of the risk associated with Desogen and deep vein
thrombosis and that she also would have discussed
with the decedent all side effects and the symptoms
associated therewith before prescribing the medication.
The decedent's patient file, which was a computer gen-
erated file created to replace the file lost by the defen-
dants, had no indication that Dr. Kroll had given an
advisement to the decedent or the content of such an
advisement, despite Dr. Kroll's testimony that it was
her practice to dictate the results of a patient's examina-
tion and her recommendations, which then were stored
electronically. Nevertheless, Dr. Kroll testified that she

told the decedent and all her patients for whom she prescribed birth control pills that there is an increased risk of blood clots, that blood clots are potentially life threatening, and that the symptoms of blood clots are pain, as a result of leg swelling, and redness. Counsel for the plaintiff then pointed out to Dr. Kroll that when Dr. Kroll was questioned in a deposition on March 2, 2005, she had never mentioned telling the decedent to watch for pain but only that she should watch for swelling; Dr. Kroll then stated that she stood by her deposition testimony. Counsel for the plaintiff then asked: "And standing by your deposition, doctor, would mean that when you counsel the patient about warning signs, the warning sign that you counsel is swelling. Right?" Dr. Kroll answered: "Swelling. Yes." Dr. Kroll also stated that she would expect a patient, who has been properly counseled by her physician, to seek medical treatment when symptoms develop.

The plaintiff's expert, Kenneth R. Ackerman, a board certified physician in internal medicine, testified that patients "put on birth control pills . . . have a statistically increased risk of forming blood clots." He also stated that his opinion would not change on the basis of the name of the birth control pill, whether it was Desogen, Apri or some other formulation. Dr. Ackerman also stated that "[a]n internist would expect that a reasonable patient, who has been advised properly, will recognize the appropriate side effects of the medication . . . and receive medical attention . . . should those symptoms or signs appear."

The deposition testimony of the decedent's husband was read for the jury. In relevant part, her husband had testified that the decedent had told him that she had pain in her groin but that she could not figure out why.[4]

---

[4] "Connecticut has adopted a 'dead man's statute,' which provides that in actions by or against the representative of deceased persons, the entries, memoranda and declarations of the deceased relevant to the matter at issue may be received as evidence." J. Lagnese, C. Anderson & F. Santoro,

She speculated to him that perhaps she had pulled a muscle. Stilwell, the decedent's mother, testified at trial that the decedent told her when she started taking the prescribed birth control pills and that the decedent also told her that she telephoned Dr. Kroll's office near the end of May because she was not feeling well taking the medication, and she wanted to stop but that Dr. Kroll asked her to continue taking it. She further testified that she and the decedent attended a meeting the Thursday evening before the decedent died but that the decedent had to leave the meeting because she was experiencing considerable leg pain of an unknown cause. Further, Stilwell testified that the decedent went to work the following day but had to leave work early because of significant and continued leg pain. The decedent then speculated to Stilwell that maybe she had pulled a muscle; Stilwell said that the decedent "truly had no idea what was wrong with her."

In this case, the court directed a verdict on the ground that a failure to warn claim could not be based solely on an inference drawn from the decedent's failure to seek help. Although we agree with such a statement, we conclude that there was other evidence from which such an inference reasonably could have been drawn. "[T]he line between permissible inference and impermissible speculation is not always easy to discern. When we infer, we derive a conclusion from proven facts because such considerations as experience, or history, or science have demonstrated that there is a likely correlation between those facts and the conclusion. If that correlation is sufficiently compelling, the inference is reasonable. But if the correlation between the facts and the conclusion is slight, or if a different conclusion is more closely correlated with the facts than the chosen conclusion, the inference is less reasonable. At some

Connecticut Medical Malpractice (2007) § 17-6, p. 143; see General Statutes § 52-172.

point, the link between the facts and the conclusion becomes so tenuous that we call it speculation. When that point is reached is, frankly, a matter of judgment." (Internal quotation marks omitted.) *State* v. *Reynolds*, 264 Conn. 1, 93, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004).

Viewing the evidence in the light most favorable to the plaintiff, we conclude the jury reasonably could have found that the decedent did not seek help from the medical community because she had no idea what was the cause of her severe leg pain; such an inference would have been reasonable in this case because the decedent had told her husband that she could not figure out why she was experiencing pain in her groin, and she had expressed to her mother that she had no idea what was the cause of her pain, and further, this puzzlement occurred one month after her office visit with Dr. Kroll. The jury could have inferred that the reason the decedent had no idea what was the cause of her leg pain was because Dr. Kroll had not informed her adequately of the risks associated with birth control pills and had not explained fully the signs and symptoms associated with such risks, especially that the use of the pill increased the possibility of blood clots, that blood clots could be life threatening and that severe leg pain was a symptom associated with blood clots, which must be dealt with immediately. See *State* v. *Crafts*, supra, 226 Conn. 245 ("[t]here is, in fact, no rule of law that forbids the resting of one inference upon facts whose determination is the result of other inferences" [internal quotation marks omitted]). The jury also could have drawn an inference from the absence of a statement in the computer generated patient file indicating that Dr. Kroll had provided such information to the decedent, namely, that no such advice had been given about the side effects.

We also find two decisions from other states to be informative to our analysis in the present case. In *Healy* v. *Langdon*, 245 Neb. 1, 511 N.W.2d 498 (1994), the plaintiff, James Healy, acting as the administrator of his deceased wife's estate, commenced an action against a physician, asserting that the physician had failed to inform the decedent that death was a possible side effect of chemotherapy. Both sides agreed as to the standard of care and that such warning was necessary. Id., 8. The physician moved for summary judgment and submitted an affidavit attesting that he had given the decedent the proper warning. Id., 7–8. The plaintiff, however, offered his own affidavit, which stated that he had attended all of the decedent's office visits with the physician and that the physician had not informed the decedent that death was a potential side effect of the chemotherapy. Id., 8–9. The record also had contained a form from the physician's file that was entitled " 'Consent to Chemotherapy,' " which was signed by the decedent. Id. Although many side effects were listed on this form, death was not listed as a possible side effect. Id. The court explained: "For purposes of summary judgment, the affidavit presented by [the plaintiff] raises the question that [the decedent] was never warned that death could result from the chemotherapy. . . . The consent form raises a similar inference. These inferences directly conflict with the evidence presented by [the physician]. Such a conflict signals the presence of a genuine issue of material fact; the relative credibility of [the plaintiff and the physician] is a question which can only be resolved by a jury." Id. The Nebraska Supreme Court then reversed the trial court's rendering of summary judgment and remanded the case for further proceedings. Id.

The present case is distinguishable from *Healy* because no one was with the decedent and Dr. Kroll during their office visit. Nevertheless, we conclude that the cases are similar enough; evidence that the decedent

stated to others, one month after her office visit with Dr. Kroll, that she had no idea what could be the cause of her severe leg pain, combined with the lack of a statement in the medical file that the doctor had provided the necessary warnings to the decedent, could have provided a sufficient basis for the jury to have drawn a reasonable inference that Dr. Kroll had not provided the decedent with the necessary warnings and instructions.

In *Wozniak* v. *Lipoff*, 242 Kan. 583, 750 P.2d 971 (1988), a medical malpractice action brought on behalf of the survivors of the decedent, who suffered from Graves' disease, the plaintiffs alleged that the decedent's physician had been negligent in several ways, all leading to the decedent's suicide. One of the specifications of negligence alleged that the physician had failed to formulate and communicate a definitive treatment plan to the decedent. Id., 588. The standard of care required that "the disease, with its complications, treatments, and side effects, be carefully explained to the patient." Id., 588. The physician testified that he had discussed these things with the decedent, and a member of his office staff testified that she saw the physician reading a pamphlet about the disease. Id., 588–89. Despite this testimony, the medical record contained no notation that such an explanation had been given to the decedent. On appeal, the Kansas Supreme Court concluded that because there was a conflict in the evidence, a directed verdict was inappropriate. Id., 589.

In the present case, the evidence, viewed in the light most favorable to the plaintiff, reasonably could have led the jury to find that Dr. Kroll prescribed the birth control pill to the decedent slightly more than four weeks before the decedent's death, and that Dr. Kroll made no notation that she had given the decedent a proper warning of the risks and the signs and symptoms associated with such risks. Further, the jury could have found that the decedent experienced feelings of ill

health shortly after beginning the pills and that she telephoned Dr. Kroll's office about this but was told to continue taking the pills. A short time later, when the decedent experienced severe leg pain over the course of a couple of days, she had no idea what was the cause of that pain. Additionally, the jury could have found that persons generally seek to follow instructions of a medical nature concerning the serious symptoms associated with the side effects of medication.[5] These findings could have led the jury to the reasonable inference that Dr. Kroll, four weeks before the decedent's death, had not discussed the signs and symptoms associated with the risks of birth control pills adequately with the decedent, because, if she had discussed them adequately, the decedent would have known that this might be the cause of her pain. The decedent's complete lack of knowledge and puzzlement as to the cause of her pain, combined with other evidence, reasonably could have led the jury to the inference that the decedent had not been informed adequately by Dr. Kroll. Accordingly, we conclude that the court should not have directed a verdict in favor of the defendants but should have given the jury the opportunity to weigh this evidence and decide the issue.

The judgment is reversed and the case is remanded for a new trial.

In this opinion the other judges concurred.

---

[5] In addition to the testimony on this issue, such a finding could be based on the same rationale that justifies the introduction of statements made for the purpose of obtaining medical treatment, namely that the patient has an interest in preserving her own health. See Conn. Code Evid. § 8-3 (5).