******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* TOBY
ARTHUR BERTHIAUME
(AC 37913)

DiPentima, C. J., and Keller and Flynn, Js.

*Argued October 6, 2016—officially released March 14, 2017*

(Appeal from Superior Court, judicial district of
Hartford, Mullarkey, J.)

*Conrad Ost Seifert*, assigned counsel, for the appellant (defendant).

*Toni M. Smith-Rosario*, senior assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, *Vicki Melchiorri*, supervisory assistant state's attorney, *David L. Zagaja*, senior assistant state's attorney, and *Thomas R. Garcia*, former senior assistant state's attorney, for the appellee (state).

*Opinion*

FLYNN, J. The defendant, Toby Arthur Berthiaume, appeals from the judgment of conviction, rendered after a jury trial, of burglary in the first degree in violation of General Statutes § 53a-101 (a) (2). On appeal, the defendant claims (1) there was insufficient evidence to convict him of burglary in the first degree, and (2) even if there were sufficient evidence to sustain his conviction, the trial court committed plain error by failing to exclude evidence of an eyewitness identification of the defendant. Unpersuaded by either claim, we affirm the judgment of the trial court.

The jury reasonably could have found the following facts. In mid-2013, the victim, Simone LaPointe, was ninety-three years old and resided at 126 Windsor Street in Enfield, her home for over four decades. She suffered from dementia and short term memory loss, and although she lived alone, was accompanied by either a friend or one of her surviving eleven children "most of the time." Typically, the victim's friend stayed with her overnight, and her children took turns visiting her throughout the day. Despite this visitation schedule, there were gaps of time throughout the day in which the victim was home alone. Because the victim neither drove nor owned a car, her driveway would be empty during these gap periods, thus indicating that she was alone.

On May 6, 2013, Marita Cunningham, one of the victim's daughters, arrived at 126 Windsor Street around noon, and departed, leaving the victim home alone, at approximately 12:50 p.m. When Cunningham left 126 Windsor Street, nothing inside the residence looked out of order and the victim was uninjured. About one hour later, Jessica Navarro-Gilmore, while passing by in a motor vehicle, saw the defendant and another white man "walking suspiciously" on a road near the victim's home while carrying what appeared to be "a twenty inch flat screen . . . TV or monitor . . . ." The two men were "walking quickly and looking over their shoulder[s] suspiciously." Drawing on her own experience committing theft offenses, Navarro-Gilmore immediately suspected that the two men had stolen something from a home in the neighborhood.[1] After doubling back to get a better look at the men, Navarro-Gilmore called the police at 1:53 p.m. and reported what she had seen.

At approximately 3 p.m., the victim called Norma Shannon, another of her daughters, and told Shannon that her knee was bleeding. Shannon went to 126 Windsor Street in response to the call, and upon entering, noticed that "the house had been ransacked . . . ." Various drawers and cabinets inside the house had been left open, jewelry and other items were lying on the victim's bed and dresser "as if they had been dumped there," and the dining room chandelier was broken.

There was blood on the floor of the dining room, and the phone line in the living room, which was adjacent to the dining room, had been cut. The victim's knee was bandaged, and she had sustained a "mark on her nose," a bruise on her face, and a chipped tooth. A search of the home revealed that the victim's ring, which contained fourteen birthstones, and her nineteen inch flat screen television, had been stolen.

At 3:44 p.m., the defendant sold what was later determined to be the victim's ring and television at the Money Shop, a pawn shop and jewelry store located in Springfield, Massachusetts. In order to make the sales, the defendant provided Jeffrey Fiske, the owner of the pawn shop, with his identification and had his photograph taken. The defendant also provided his address, 116 Windsor Street, and telephone number. Fiske identified the defendant as the person who received the sales proceeds.

Thereafter, police showed Navarro-Gilmore a sequential photographic array that did not include a photograph of the defendant, and she did not identify anyone as one of the men she saw carrying the television on May 6, 2013. After developing the defendant as a suspect, Detective Brian Callaghan of the Enfield Police Department searched the New England State Police Information Network, a database wherein local pawn shops record their daily transactions, which returned information on the Money Shop. On June 11, 2013, Fiske provided Detective Callaghan with sales slips, the defendant's photograph, and the victim's television and ring.[2]

The defendant was arrested on July 3, 2013, and charged with burglary in the first degree and several other offenses.[3] Two days later, the defendant's booking photograph, along with an article referencing the burglary, was published in the Enfield Patch, a local online newspaper. While browsing online, Navarro-Gilmore saw the defendant's photograph and immediately recognized him as one of the men she saw carrying the television on May 6, 2013. Thereafter, Detective Callaghan contacted Navarro-Gilmore to request that she view another photographic array. Navarro-Gilmore indicated that she already had seen the defendant's photograph in the Enfield Patch and therefore could not fairly participate in an identification procedure.

On April 7, 2014, following a trial, the jury found the defendant guilty of burglary in the first degree. The court imposed a total effective sentence of twenty years incarceration. This appeal followed. Additional facts and procedural history will be set forth where necessary to the resolution of the defendant's claims.

I

The defendant first claims that there was insufficient evidence to convict him of burglary in the first degree.

Specifically, he argues that the state failed to adduce evidence from which the jury reasonably could have concluded beyond a reasonable doubt that he remained unlawfully inside the victim's home with the intent to commit a crime therein, or that he had knowingly or recklessly inflicted bodily injury on the victim. Additionally, the defendant contends there was insufficient evidence that he was the person who injured the victim while remaining unlawfully inside her residence because Navarro-Gilmore's testimony revealed the presence of a second, unidentified white man who was seen on a nearby street and could have injured the victim. We disagree with both contentions.

The following principles guide our resolution of the defendant's sufficiency of the evidence claim. "Unlike Aristotelian and Thomistic logic, law does not demand metaphysical certainty in its proofs. In law, we recognize three principal proofs: beyond a reasonable doubt, which is the very high burden in a criminal case; clear and convincing evidence, required to prove fraud and certain other claims, which equates to a very high probability; and preponderance of the evidence, applied to civil claims generally, which means it is more probable than not. None of these varying proofs require absolute certainty." (Footnote omitted.) *Curran* v. *Kroll*, 118 Conn. App. 401, 408, 984 A.2d 763 (2009), aff'd, 303 Conn. 845, 37 A.3d 700 (2012).

"To meet one's burden of proof, evidence is necessary. This evidence comes in two forms, direct and circumstantial. 'The basic distinction between direct and circumstantial evidence is that in the former instance the witnesses testify directly of their own knowledge as to the main facts to be proved, while in the latter case proof is given of facts and circumstances from which the jury may infer other connected facts which reasonably follow, according to common experience.' 29 Am. Jur. 2d 329, Evidence § 313 (1994). 'Proof of a fact by the use of circumstantial evidence usually involves a two-step process. A fact is first established by direct evidence, which is ordinarily eyewitness or other direct testimony. That direct evidence can serve as a basis from which the jury infers another fact. Thus, the direct evidence may operate as circumstantial evidence from which a fact is inferred by the jury.' *State* v. *Sullivan*, 11 Conn. App. 80, 97, 525 A.2d 1353 (1987), citing *State* v. *Rome*, 64 Conn. 329, 334, 30 A. 57 (1894). 'When the necessity to resort to circumstantial evidence arises either from the nature of the inquiry or the failure of direct proof, considerable latitude is allowed in its reception.' 29 Am. Jur. 2d 331, Evidence § 315 (2008).

" 'An inference is a factual conclusion that can rationally be drawn from other facts. If fact A rationally supports the conclusion that fact B is also true, then B may be *inferred* from A. The process of drawing inferences based on a rough assessment of probabilities

is what makes indirect or circumstantial evidence relevant at trial. If the inference (fact B from fact A) is strong enough, then fact A is relevant to prove fact B. Inferences are by their nature permissive, not mandatory: although the fact proved rationally supports the conclusion the offering party hopes will be inferred, the factfinder is free to accept or reject the inference.' . . . 1 C. Fishman, Jones on Evidence (1992) § 4:1, pp. 299–300; see also D. Faulkner & S. Graves, Connecticut Trial Evidence Notebook (2d Ed. 2008 Rev.) I-14.'' (Emphasis in original.) *Curran* v. *Kroll*, supra, 118 Conn. App. 409–10.

"In reviewing a sufficiency of the evidence claim, we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [trier of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . In evaluating evidence, the trier of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The trier may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . . This does not require that each subordinate conclusion established by or inferred from the evidence, or even from other inferences, be proved beyond a reasonable doubt . . . because this court has held that a [trier's] factual inferences that support a guilty verdict need only be reasonable. . . .

"[A]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the trier, would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [trier's] verdict of guilty. . . . Furthermore, [i]n [our] process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence." (Internal quotation marks omitted.) *State* v. *Butler*, 296 Conn. 62, 76–77, 993 A.2d 970 (2010).

"[P]roof of a material fact by inference from circumstantial evidence need not be so conclusive as to exclude every other hypothesis. It is sufficient if the evidence produces in the mind of the trier a reasonable belief in the probability of the existence of the material

fact. . . . Thus, in determining whether the evidence supports a particular inference, we ask whether that inference is so unreasonable as to be unjustifiable. . . . In other words, an inference need not be compelled by the evidence; rather, the evidence need only be reasonably susceptible of such an inference. Equally well established is our holding that a jury may draw factual inferences on the basis of already inferred facts. . . . Moreover, [i]n viewing evidence which could yield contrary inferences, the jury is not barred from drawing those inferences consistent with guilt and is not required to draw only those inferences consistent with innocence." (Citations omitted; internal quotation marks omitted.) *State* v. *Copas*, 252 Conn. 318, 339–40, 746 A.2d 761 (2000).

"Review of any claim of insufficiency of the evidence introduced to prove a violation of a criminal statute must necessarily begin with the skeletal requirements of what necessary elements the charged statute requires to be proved." *State* v. *Pommer*, 110 Conn. App. 608, 613, 955 A.2d 637, cert. denied, 289 Conn. 951, 961 A.2d 418 (2008). "Once analysis is complete as to what the particular statute requires to be proved, we then review the evidence in light of those statutory requirements. Our review standard is well settled." Id.

A person is guilty of the crime of burglary in the first degree when he "enters or remains unlawfully in a building with intent to commit a crime therein and, in the course of committing the offense, intentionally, knowingly or recklessly inflicts or attempts to inflict bodily injury on anyone . . . ." General Statutes § 53a-101 (a) (2).

In the present case, the defendant correctly points out the lack of direct evidence—in the form of fingerprints, DNA or eyewitness testimony—establishing his presence inside the victim's home. Nevertheless, we conclude that the state introduced sufficient circumstantial evidence upon which the jury reasonably could have found not only that the defendant was present in the victim's home, but also that each element of the crime of burglary in the first degree had been proven beyond a reasonable doubt. As an initial matter, we note that the defendant was photographed selling the victim's stolen ring and television at a pawn shop shortly after the items were discovered to be stolen. From that evidence, the jury reasonably could have inferred not just that the defendant had received or was in possession of the stolen items, as the defendant argues, but that he was the person who stole them. See *State* v. *Higgins*, 201 Conn. 462, 473, 518 A.2d 631 (1986) ("[t]he possession of property recently stolen, if unexplained and standing alone or without other facts pointing to a contrary conclusion, [supports the] inference that the possessor stole the property" [internal quotation marks omitted]). Because the victim's television and ring were

located inside the victim's home and the defendant later possessed and sold these stolen items, it was reasonable for the jury to conclude that the defendant entered into the victim's home in order to steal them.

Proceeding from that premise, we address the remainder of the evidence that, in our view, established a strong circumstantial case against the defendant. Cunningham testified that she had visited the victim around noon on May 6, 2013, at which time the home was intact and the victim was uninjured, and that she left the victim home alone at approximately 12:50 p.m. The defendant, who lived only a few houses away from the victim at 116 Windsor Street, was in a position to know that the victim was alone and thus vulnerable because he could see that no cars were in her driveway. One hour after Cunningham left, at around 1:53 p.m., Navarro-Gilmore saw the defendant and a second white man "walking suspiciously," as if they had stolen something, down a nearby street while carrying a flat screen television or monitor. Shortly thereafter, the victim called Shannon, her daughter, and told Shannon that her knee was bleeding. Shannon arrived at the victim's residence to find it in a state of disarray. Items had been hastily "dumped" out, various drawers and cabinets were open, and a crystal from the dining room chandelier had fallen to the floor, suggesting that someone had ransacked the home in search of valuables. The victim's television and ring had been stolen. There was blood on the dining room floor, and the victim had sustained a bloody knee, chipped tooth, and bruised face, all signs that a struggle had taken place. All of this evidence, in combination with the defendant's sale of the victim's stolen ring and television shortly thereafter, supports the inference that the defendant remained unlawfully in the victim's home with the intent to commit a crime therein, namely, larceny. See, e.g., *State* v. *Cote*, 136 Conn. App. 427, 445–46, 46 A.3d 256 (2012) ("[i]n sustaining [burglary] convictions based entirely on circumstantial evidence, this court has relied on evidence that the defendant was at or near the residence at about the time of the burglary and that the defendant was in possession of items stolen from the residence thereafter" [internal quotation marks omitted]), aff'd, 314 Conn. 570, 107 A.3d 367 (2014).

We note that although there were no signs of a forced entry, the jury nevertheless could have concluded that the defendant "remain[ed] unlawfully" in the victim's residence.[4] General Statutes § 53a-101 (a) (2). "A person 'enters or remains unlawfully' in or upon premises when the premises, at the time of such entry or remaining, are not open to the public and when the actor is not otherwise licensed or privileged to do so." General Statutes § 53a-100 (b). Even if the victim had consented to the defendant's initial entry into her home, the jury reasonably could have inferred from the victim's injuries and other signs that a physical altercation took

place, as well as from the fact that the victim's television and ring had been stolen, that the defendant exceeded the scope of that consent by assaulting[5] the victim and stealing her items, thus rendering his continued "remaining" inside her residence unlawful. See *State* v. *Bharrat*, 129 Conn. App. 1, 26–27, 20 A.3d 9 (finding sufficient evidence that defendant "unlawfully remained" in victim's home because although victim consented to defendant spending night, "defendant's remaining in the premises became unlawful because he had exceeded the scope of the victim's consent" by engaging in criminal activity), cert. denied, 302 Conn. 905, 23 A.3d 1243 (2011); *State* v. *Gelormino*, 24 Conn. App. 563, 572, 590 A.2d 480 (defendant's remaining in victim's residence was unlawful because "even if the evidence could be construed to show the victim's implicit consent to the defendant's entry, the vicious assault perpetrated on the victim was clearly not within the scope of that consent"), cert. denied, 219 Conn. 911, 593 A.2d 136 (1991).

Finally, we must determine whether there was sufficient evidence to support the jury's finding that the defendant, in the course of committing the burglary, "knowingly or recklessly inflict[ed] . . . bodily injury" on the victim. General Statutes § 53a-101 (a) (2). As previously noted, the state adduced evidence that the victim was uninjured as of 12:50 p.m., and that by at least 3 p.m. had sustained a bloody injury to her knee, a mark on her nose, a bruise on her face, and a chipped tooth. During that same time period, around 1:53 p.m., the defendant was observed "walking suspiciously" with a second man away from the victim's residence with what appeared to be a television, and was photographed selling the victim's stolen items approximately two hours later in Springfield, Massachusetts. The chandelier in the victim's dining room was broken, there was blood on the floor, and the telephone cord in the adjacent room was cut. Cunningham testified that despite the victim's advanced age, she was a "feisty individual" who would "try to stand up for herself and . . . fight back" if someone tried to "push their way" into her home. From this evidence, the jury reasonably could have concluded that the victim resisted the defendant's attempts to burglarize her home, prompting the defendant to physically assault the victim and to cut the telephone wire to prevent her from contacting help.[6]

Despite this evidence and authority, the defendant argues that there was insufficient evidence that he inflicted bodily harm on the victim because Navarro-Gilmore testified that, when she saw the defendant walking down a nearby street with the television, he was accompanied by a second, suspicious looking white man. We are not persuaded that Navarro-Gilmore's testimony regarding the presence of a second white man on the street renders the evidence insufficient as a matter of law. Essentially, the defendant's argument is

that the jury could have inferred that the second man had been inside the victim's residence and had participated in the burglary, and, thus, could have been the person who inflicted bodily injury on the victim. In determining whether there was sufficient evidence to sustain a conviction, however, "the trier of fact [in evaluating evidence] is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The trier may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." (Internal quotation marks omitted.) *State* v. *Butler*, supra, 296 Conn. 76. Thus, "[o]n appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [trier's] verdict of guilty." (Internal quotation marks omitted.) Id., 77.

In view of that principle, the jury was not required to infer that the second man had been present inside the victim's home during the burglary, much less that he, and he alone, inflicted bodily harm on the victim.[7] The defendant's argument is essentially one of third-party culpability and there was no evidence presented at trial concerning the identity of the second man or his alleged role, if any, in the burglary.[8] Cf. *State* v. *Arroyo*, 284 Conn. 597, 610, 935 A.2d 975 (2007) (noting, for purposes of third-party liability jury instruction, that "[e]vidence that would raise only a bare suspicion that a third party, rather than the defendant, committed the charged offense would not be relevant to the jury's determination").[9] The defendant, on the other hand, was established to have lived a few houses away from the victim and thus to have been in a position to know that the victim was home alone. Additionally, after Navarro-Gilmore saw the defendant and a second man leaving the victim's neighborhood, the defendant traveled to Springfield, Massachusetts, and sold the victim's items for $355, which bespeaks a principal role in the crime. See *State* v. *Rivera*, 39 Conn. App. 96, 104, 664 A.2d 306 ("possession of recently stolen property raises a permissible inference of criminal connection with the property, and if no explanation is forthcoming, the inference of criminal connection may be as a principal in the theft" [internal quotation marks omitted]), cert. denied, 235 Conn. 921, 665 A.2d 908 (1995). There was no evidence that the second man accompanied the defendant on this trip or shared in the proceeds of the crime. Finally, the jury could have inferred that the defendant, rather than the second man, was the one Navarro-Gilmore saw carrying the television away from the victim's residence.[10] Given the defendant's connection to the victim's residence, the evidence that he was seen leaving the neighborhood carrying the victim's stolen television, and the fact that he was photographed reaping the benefits of the crime, we cannot conclude

that there did not exist a reasonable view of the evidence to support the jury's finding that the defendant knowingly or recklessly inflicted bodily injury on the victim in the course of burglarizing her home. Accordingly, we conclude that the state adduced sufficient evidence to sustain the defendant's conviction for burglary in the first degree.

## II

The defendant next claims that his conviction should be reversed because the court improperly failed to exclude, under *State* v. *Holliman*, 214 Conn. 38, 570 A.2d 680 (1990), evidence of Navarro-Gilmore's identification of him as one of the individuals she saw walking away from the victim's home immediately after the burglary. The defendant contends that even though Navarro-Gilmore was a private actor, her conduct in identifying the defendant was unduly suggestive and such unreliable identifications must be suppressed even in the absence of state action. As the defendant acknowledges, however, the rule established in *Holliman* for the exclusion of identifications tainted by unduly suggestive private conduct is purely evidentiary, and he did not object in the trial court to the admission of Navarro-Gilmore's identification on evidentiary grounds. Accordingly, the defendant seeks review of this unpreserved evidentiary claim under the plain error doctrine.[11] We disagree that the court committed plain error by failing to exclude Navarro-Gilmore's identification.

The following additional facts and procedural history are relevant to this claim. On March 14, 2014, the defendant moved to suppress "any and all in-court or out-of-court identifications of [him] . . . because said identifications were obtained in violation of [his] rights." In support of his argument, the defendant relied on various state and federal constitutional provisions, as well as the United States Supreme Court's decision in *Manson* v. *Brathwaite*, 432 U.S. 98, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977), but he neither cited to *State* v. *Holliman*, supra, 214 Conn. 38, nor mentioned any evidentiary grounds for exclusion. The court held a hearing on April 2, 2014, at which Detective Callaghan was the sole witness. Detective Callaghan testified that he called Navarro-Gilmore to arrange for her to view a second photographic array but, before he could mention specifics, Navarro-Gilmore stated that she had already seen the defendant's photograph in the Enfield Patch and recognized him as the person she saw on May 6, 2013. During argument on the motion, the defendant again did not raise *Holliman* or any evidentiary bases for exclusion of Navarro-Gilmore's identification. Instead, his argument focused entirely on the issue of whether the identification was procured through state action. Doubting that state actors were involved in the identification, the court permitted the defendant to

elicit additional testimony from Navarro-Gilmore outside the presence of the jury on April 4, 2014. Although the court did not issue a ruling at the conclusion of Navarro-Gilmore's additional testimony, it permitted her to testify before the jury as to her identification of the defendant. The defendant did not object to the identification. The court subsequently issued a memorandum of decision dated April 8, 2014, denying the motion to suppress because "[t]here was no police or governmental action involved in the identification."

It is well settled that "[d]ue process requires that [eyewitness] identifications [may be admitted at trial] only if they are reliable and are not the product of unnecessarily suggestive police procedures." (Internal quotation marks omitted.) *State* v. *Johnson*, 312 Conn. 687, 696, 94 A.3d 1173 (2014). In *State* v. *Holliman*, supra, 214 Conn. 45–46, our Supreme Court held that, in the absence of state action, unnecessarily suggestive identification procedures conducted solely by private actors do not implicate the defendant's federal due process rights. Nevertheless, the court in *Holliman* also held that, as an evidentiary matter, "the criteria established for determining the admissibility of identifications in the due process context are appropriate guidelines by which to determine the admissibility of identifications that result from procedures conduct by civilians." Id., 46. Thus, to determine whether eyewitness identifications resulting from procedures undertaken by private actors are inadmissible as a matter of evidentiary law, the court must first determine "whether the identification procedure was unnecessarily suggestive, and second, if it is found to be so . . . whether the identification was nevertheless reliable based on an examination of the totality of the circumstances."[12] (Internal quotation marks omitted.) Id.

In the present case, the defendant does not contest the court's finding that Navarro-Gilmore's identification did not violate his due process rights because it did not involve state action. Thus, the defendant's claim that the identification was tainted by unduly suggestive private conduct is purely evidentiary, and is unreviewable because it was not raised in the suppression hearing or at trial. See *State* v. *Johnson*, supra, 312 Conn. 705 n.19 ("[i]t is clear . . . that the defendant's claim that the victim's identification of the defendant was inadmissible because it involved unduly suggestive private conduct . . . is unreviewable because, in the absence of improper state action, any such claim is evidentiary and was not preserved" [citation omitted]). Conceding that his claim under *Holliman* is unreviewable, the defendant seeks relief under the plain error doctrine. We disagree that the court's admission of Navarro-Gilmore's identification of the defendant constituted plain error.

The plain error doctrine "is an extraordinary remedy

used by appellate courts to rectify errors committed at trial that, although unpreserved, are of such monumental proportion that they threaten to erode our system of justice and work a serious and manifest injustice on the aggrieved party. [T]he plain error doctrine . . . is not . . . a rule of reviewability. It is a rule of reversibility. That is, it is a doctrine that this court invokes in order to rectify a trial court ruling that, although either not properly preserved or never raised at all in the trial court, nonetheless requires reversal of the trial court's judgment, for reasons of policy. . . . In addition, the plain error doctrine is reserved for truly extraordinary situations [in which] the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . Plain error is a doctrine that should be invoked sparingly." (Internal quotation marks omitted.) *State* v. *Sanchez*, 308 Conn. 64, 76–77, 60 A.3d 271 (2013).

Our review of claims of plain error involves a two step process. "First, we must determine whether the trial court in fact committed an error and, if it did, whether that error was indeed plain in the sense that it is patent [or] readily discernable on the face of a factually adequate record, [and] also . . . obvious in the sense of *not debatable*." (Emphasis in original; internal quotation marks omitted.) *State* v. *Coward*, 292 Conn. 296, 307, 972 A.2d 691 (2009). Under this standard, "it is not enough for the defendant simply to demonstrate that his position is correct. Rather, the party seeking plain error review must demonstrate that the claimed impropriety was so clear, obvious and indisputable as to warrant the extraordinary remedy of reversal." Id. Furthermore, "although a clear and obvious mistake on the part of the trial court is a prerequisite for reversal under the plain error doctrine, such a finding is not, without more, sufficient to warrant the application of the doctrine. Because [a] party cannot prevail under plain error unless it has demonstrated that the failure to grant relief will result in manifest injustice . . . under the second prong of the analysis we must determine whether the consequences of the error are so grievous as to be fundamentally unfair or manifestly unjust. . . . Only if both prongs of the analysis are satisfied can the appealing party obtain relief." (Citations omitted; internal quotation marks omitted.) Id.

With the *Holliman* standard in mind, we conclude, on the basis of the totality of the evidence introduced at trial, that the defendant's claim fails the first prong of the plain error analysis. That is, the defendant has failed to establish that the court, in admitting Navarro-Gilmore's identification, committed an error that was "so clear, obvious and indisputable as to warrant the extraordinary remedy of reversal." Id. Navarro-Gilmore testified that she fortuitously happened upon the defendant's booking photograph while perusing the Enfield Patch, and immediately recognized him as one of the

men she saw on May 6, 2013, carrying the victim's television. While the photograph was accompanied by an article detailing the location of and circumstances surrounding the burglary, Navarro-Gilmore testified that her recognition occurred instantaneously when she saw the photograph and was not at all based upon the article. She further testified that she declined Detective Callaghan's invitation to view a photographic array because, having already seen the defendant's photograph, "it would not [have] be[en] fair" for her to view a photographic array. Given that evidence, it was not plain error for the trial court to have concluded that the identification was not the product of unduly suggestive private conduct by Navarro-Gilmore and, thus, admissible under *Holliman*.

The judgment is affirmed.

In this opinion DiPENTIMA, C. J., concurred.

[1] At the time she testified at trial, Navarro-Gilmore had three convictions for larceny in the sixth degree and a fourth larceny charge that was pending.

[2] Detective Callaghan determined that the television stolen from the victim's home and the one the defendant sold at the pawn shop had the same serial number. The ring sold by the defendant contained fourteen stones, matching the description of the ring that was stolen.

[3] When the defendant's trial began, the defendant also was charged, by an amended information dated April 2, 2014, with being an accessory to burglary in the first degree in violation of General Statutes §§ 53a-8 and 53a-101 (a) (2), and with conspiracy to commit burglary in the third degree in violation of General Statutes §§ 53a-48 and 53a-103 (a). During trial, at the conclusion of the state's case-in-chief and after argument on the defendant's motion for a judgment of acquittal, the state filed the operative charging document, an amended information dated April 4, 2014, which dropped the conspiracy count and accessory liability theory. Thus, when the case went to the jury, the defendant was charged solely with committing, as a principal perpetrator, burglary in the first degree.

[4] Because the state charged the defendant with remaining unlawfully inside the victim's residence with the intent to commit a crime therein, it did not have to prove that the defendant's entry into the residence was unlawful. See *State* v. *Peay*, 96 Conn. App. 421, 439, 900 A.2d 577 ("[§] 53a-101 (a) does not require the state to prove that the defendant forcibly entered the building" provided that he "remained unlawfully" in building), cert. denied, 280 Conn. 909, 908 A.2d 541 (2006).

[5] As we will explain, the presence of the second man after the burglary does not negate the jury's finding that the defendant knowingly or recklessly inflicted bodily injury on the victim during the burglary.

[6] In view of this evidence, we reject the defendant's suggestion that the evidence was insufficient because the victim, given her age, could have injured herself by falling. The jury reasonably could have concluded that the perpetrator assaulted the victim in order to incapacitate her while he was searching the home for valuables. Indeed, Cunningham testified that the victim was readily able to move around and was not prone to falling.

[7] For example, in *State* v. *Cote*, supra, 136 Conn. App. 443, this court rejected the defendant's claim on appeal that, "in the absence of a jury instruction on accessory liability, there was insufficient evidence presented to prove that the defendant committed burglary in the third degree." The defendant, along with a second man, were stopped while driving a vehicle that matched the description of the vehicle previously observed in front of the burglarized home, and various items that had been stolen from the home were found inside their vehicle. Id., 445. In light of this evidence, as well as evidence that the two men worked together to perpetrate other burglaries, this court concluded that although there was no evidence establishing that the defendant was the person who entered the home and stole the items, there was nonetheless sufficient evidence to sustain his conviction because the jury could have found that both men had committed the burglary. Id., 447–48. The defendant then argued that the evidence was insufficient because there was evidence establishing that only one of the two men could

have entered the home, namely, the single set of footprints in the snow outside the home and the other evidence suggesting that somebody had moved the vehicle. Id., 448. This court rejected that argument on the ground that, on appeal, the evidence upon which a defendant is convicted is not rendered insufficient merely because it may be interpreted "to support a reasonable hyphothesis of innocence." Id.

[8] In our view, the concurring and dissenting judge's reliance on *State* v. *Parham*, 174 Conn. 500, 391 A.2d 148 (1978), is misplaced. In that case, the defendant challenged the court's instruction to the jury that, when two or more people participate in a burglary in the course of which one participant inflicts bodily injury on the victim, "each participant in the burglary is guilty of the aggravated offense and it is without significance that such other participant was without knowledge of the other's conduct which caused the physical injury or that he himself had no intention to cause such injury." Id., 506–507. As noted by the concurring and dissenting judge, our Supreme Court found no error in this portion of the court's charge because the defendant was also charged as an accessory under § 53a-8. See id., 507–508. The court in *Parham* went on to observe, however, that "[i]n . . . light of the evidence submitted by the state in [the] case, the jury could reasonably and logically conclude that the defendant was guilty of burglary in the first degree *either as a principal perpetrator* or as an aider or abettor." (Emphasis added.) Id., 508. The court noted the presence of the defendant's fingerprints inside the victim's home, the victim's identification of the defendant "as one of the 'men' who threw a shirt over her head," and the victim's testimony as to "her struggle with the men, how they handled her and [her] resultant injuries . . . ." Id., 508–509. Therefore, as far as the sufficiency of the evidence was concerned, the court in *Parham* suggested that the accessory theory of liability would not have been necessary to sustain the defendant's conviction because the evidence would have supported the jury's finding that the defendant, as a principal perpetrator, inflicted bodily injury on the victim. Id., 508; see *State* v. *Floyd*, 253 Conn. 700, 722–23 n.17, 756 A.2d 799 (2000) ("we concluded [in *Parham*] that the evidence in that case supported a conviction of the defendant as either an accessory or a principal"). Moreover, *Parham* is factually distinguishable from the present case. In *Parham*, the state's theory was that two men were inside the victim's home and that two men had assailed the victim in the course of perpetrating the burglary, thus raising an issue as to which of the men injured the victim; see *State* v. *Parham*, supra, 502–503; whereas in the present case there was no evidence, and the jury was not required to infer, that the second man was inside the victim's home during the burglary.

[9] The defendant did not request a third-party culpability instruction at trial.

[10] We do not agree with the concurring and dissenting judge's characterization of the record as indicating that Navarro-Gilmore "testified that both men were . . . holding [the television]." Navarro-Gilmore initially testified that she "saw two men walking suspiciously . . . carrying" the television, and that she saw "them carrying [the television] . . . ." Immediately thereafter, however, she testified that she "wasn't trying to get a good look at the [television]. I just—I was trying to get a look at who was taking it so that I honestly . . . saw it happen, we went back to turn onto White Street, I was able to get a face on view of *the person* and honestly I just—I described what I saw in the statement." (Emphasis added.) Navarro-Gilmore's testimony, viewed in the light most favorable to the state, was therefore that while she saw two people walking together away from the victim's residence, only one of them was carrying the television. Because the defendant was the person photographed selling the television at a pawn shop shortly thereafter, and thus receiving the fruits of the crime, the jury could have inferred that the man she saw carrying the television was the defendant.

[11] The defendant agrees that, because the *Holliman* rule is evidentiary in nature, his claim is not subject to review under *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989).

[12] In *Johnson*, our Supreme Court expressed doubt regarding the continued efficacy of the *Holliman* evidentiary rule in light of *Perry* v. *New Hampshire*, 565 U.S. 228, 233, 132 S. Ct. 716, 181 L. Ed. 2d 694 (2012), in which the United States Supreme Court confirmed that eyewitness identifications obtained through unduly suggestive procedures do not violate due process in the absence of state involvement, but did so on the basis of reasoning that appeared to undercut the justification for the special evidentiary rule of *Holliman*. See *State* v. *Johnson*, supra, 312 Conn. 704 n.18. Chief Justice Rogers wrote a concurring opinion in *Johnson* to "express [her] disagreement with the necessity for the special evidentiary rule of *Holliman* and

to suggest that, when the issue squarely presents itself in a future appeal, this court abandon that rule and instead hold, as did the United States Supreme Court in [*Perry*], that potentially unreliable eyewitness identifications resulting from suggestive procedures undertaken by private actors should be evaluated like any other potentially unreliable evidence . . . .” Id., 706–707. The majority echoed Chief Justice Rogers’ concerns and agreed that, in light of *Perry*, “the reasons for this court’s holding in *Holliman* are unclear.” Id., 704 n.18. Nevertheless, the court in *Johnson* did not have occasion to abandon the rule in *Holliman* because the issue was not before the court. Id. Accordingly, *Holliman* remains binding precedent for purposes of the present appeal.